[This opinion has been published in *Ohio Official Reports* at 82 Ohio St.3d 438.]

THE STATE OF OHIO, APPELLEE, *v.* CLEMONS, APPELLANT.

[Cite as *State v. Clemons*, 1998-Ohio-406.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 96-2790—Submitted April 21, 1998—Decided July 29, 1998.)

APPEAL from the Common Pleas Court of Hamilton County, No. B-9511119.

———————————

{¶ 1} On the morning of December 15, 1995, defendant-appellant, Gerald L. Clemons, went to the main office of his employer, Trans-Continental Systems, Inc., in Evendale, and fatally shot three co-workers. Defendant was subsequently convicted of three counts of aggravated murder and sentenced to death.

{¶ 2} Defendant had worked at various jobs in both Florida and the Cincinnati area. After moving back to Cincinnati in 1988, defendant became an over-the-road truck driver and worked for several trucking companies. By November 1995, defendant had become a company driver for Trans-Continental. On the evening of December 13, 1995, a dispatcher for Trans-Continental phoned defendant at home and asked him to pick up a load in Ironton, which is a regular run for Trans-Continental. Defendant declined to make the pickup and John Stirsman, chief dispatcher, told defendant that he was putting the company "in a bad spot." The company apparently then made other arrangements for the Ironton run.

{¶ 3} The next day, December 14, defendant phoned Stirsman several times hoping to secure a new run. During one conversation, defendant asked Stirsman why another dispatcher, Dave Kreamelmeyer, was "screwing him around." Stirsman replied that Kreamelmeyer was not doing that to him. Stirsman told defendant that he was saving the Ironton run for the defendant again that evening. While defendant thanked Stirsman for assigning him the Ironton run again,

defendant never showed up to make the run. Defendant later testified that he did not make the Ironton run because "it wasn't a good run for the mere fact that there is no good roads going that way and all secondary roads instead of interstate highways and it burns up a lot of time."

{¶ 4} At 7:45 a.m. on the morning of December 15, 1995, defendant called Trans-Continental, according to an entry made by Kreamelmeyer on the company's telephone log sheet. Evelyn Dinkgrave, who works in accounts payable for Trans-Continental, testified that she overheard Kreamelmeyer have a loud conversation with a driver at 7:45 a.m. that morning, and she observed that Kreamelmeyer "was kind of angry." After Kreamelmeyer hung up the phone, Dinkgrave testified that "he got more vocal about how mad he was that this guy had not been on time to pick up a load" the night before. At trial, defendant testified that during their phone conversation, Kreamelmeyer appeared to be angry and informed defendant that he was not going to give defendant a load to deliver that day.

{¶ 5} At approximately 8:15 a.m. that morning, defendant entered the Trans-Continental garage and asked mechanic Elmer Begley whether defendant's truck was ready for work. Both Begley and driver Timothy Stone testified that defendant had a cream-colored bag attached to his waist at that time and he appeared to be in a "normal mood."

{¶ 6} Secretary Dana Wilson Jones observed defendant in the administrative offices of Trans-Continental that morning. Defendant waved and smiled at her, then walked away. Moments later, Jones heard Kreamelmeyer say, "I'm going to have this man arrested for felonious assault." Then, Jones heard gunshots and heard Kreamelmeyer say, "What did I do, I didn't do anything." Jones testified that she heard more gunshots and heard someone say, "Oh, my God."

{¶ 7} Tonya Hinkle shared an office with Christine Teetzel in the Trans-Continental administrative offices, and both worked on payroll. Hinkle testified that she heard Kreamelmeyer arguing with someone around 8:15 that morning and

2

heard "a punch, like a bang." Both she and Teetzel stood up and heard Kreamelmeyer say, "Assault, call 911." As Hinkle and Teetzel tried to phone for help, they heard shots and both women hid under their desks. Teetzel pulled her chair underneath her desk in an attempt to hide herself. Hinkle testified that as they hid under their desks, she saw defendant walk up to Teetzel's desk, move her chair out of the way, look under the desk, and shoot her. As defendant turned around, Hinkle thought she was next, but defendant proceeded upstairs.

{¶ 8} Laurie McGuire works in accounts receivable for Trans-Continental on the second floor of the administrative office building. On the morning of December 15, she heard some commotion on the first floor around 8:15 a.m. and began walking downstairs. Before she made it to the first floor, she saw defendant shoot Kreamelmeyer in the back. She ran back upstairs, panic-stricken, and could hear defendant climbing the staircase. McGuire then fled into an office and stood up against a concrete wall. Defendant walked up to McGuire and told her that he was not going to hurt her, and that "he was only after the ones who screwed him over." Defendant left the room. McGuire was going downstairs when she heard dispatcher Bob Kinney scream for help from his office. McGuire found Kinney in the dispatcher's office, shot twice, holding his chest, and asking for help. McGuire saw Kreamelmeyer lying on the floor, too, so she ran back upstairs to call 911.

{¶ 9} Sandra K. Sears, a Glendale police officer, was working off-duty near the Trans-Continental office at the time of the shootings. Upon hearing a radio dispatch, she responded to the scene and followed an Evendale police officer into the Trans-Continental parking lot. Sears found Teetzel lying wounded on the front lawn of the premises. She heard Teetzel name Gerald Clemons as her assailant. As Sears approached the office building with the Evendale officer, she noticed defendant smiling and walking steadily towards her. At that point, Sears heard Teetzel exclaim again, "That's the bastard that shot me." Sears testified that defendant told her, "I'm the guy you are looking for. I just shot the people," and

he motioned his head toward the office building. Sears handcuffed Clemons and turned him over to Evendale police officers.

{¶ 10} All three shooting victims, Kreamelmeyer, Kinney, and Teetzel, died of gunshot wounds. Bullets recovered during the autopsies and casings found at the crime scene were determined to have been fired from defendant's gun, which was found lying on top of his car trunk in the Trans-Continental parking lot that morning.

{¶ 11} The grand jury indicted defendant on three counts of aggravated murder, with prior calculation and design. Each count included a firearms specification, and a death penalty specification that murder was committed as a course of conduct involving the killing of two or more persons. (R.C. 2929.04[A][5].)

{¶ 12} Defense counsel conceded at the outset of trial that defendant killed the three murder victims, but disputed that they were murdered with prior calculation and design. Defendant testified on his own behalf, and acknowledged having a discussion with Kreamelmeyer on the morning in question, in which defendant was told he was not getting a load to deliver. Defendant claimed that Kreamelmeyer started "charging at me like a rhino," but defendant testified that he then went "into a fog," and did not recall shooting anyone or his gun going off. Defendant testified that he believed that his taking of Prozac caused him to black out. The next thing defendant claims to remember was walking out to his car and seeing a crowd and police gather outside the building. Defendant testified that he "went to that woman cop because I didn't think she would slam me [to the ground]." Defendant also expressed regret and remorse for his actions.

{¶ 13} After deliberation, the jury found defendant guilty as charged.

{¶ 14} At the mitigation hearing, defendant's physician testified that he treated defendant's depression by prescribing Prozac. Defendant's mother, Alice

4

McMichen, also testified and recounted his life story. She described defendant as a caring and helpful son, and asked the jury to spare his life.

{¶ 15} Defendant gave an unsworn statement expressing his sorrow and shame for what he had done.

{¶ 16} On rebuttal, the prosecution called a professor of psychiatry who testified that studies of Prozac indicate that it decreases aggressive or violent behavior in both humans and animals. The expert opined that Prozac reduces suicidal thoughts in those who take the drug.

{¶ 17} The jury recommended death on all three counts, and the trial court imposed the death sentence on defendant. The court also imposed consecutive prison sentences on the three firearms specifications.

{¶ 18} The cause is now before this court upon a direct appeal as of right.

_____

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *William E. Breyer,* Assistant Prosecuting Attorney, for appellee.

*A. Norman Aubin* and *Herbert E. Freeman,* for appellant.

_____

**Lundberg Stratton, J.**

{¶ 19} In this appeal, defendant raises seventeen propositions of law for review. Upon review of each proposition of law, we find that none warrants reversal of defendant's convictions or death sentence. Pursuant to R.C. 2929.05(A), we have independently weighed the aggravating circumstance of each murder against the mitigating factors, and compared the sentences to those imposed in similar cases. Accordingly, we affirm defendant's convictions and uphold the sentence of death.

## PRETRIAL ISSUES
*Pretrial Publicity/Venue*

**{¶ 20}** In proposition I, defendant argues that the trial court erred by failing to change venue due to adverse pretrial publicity. In support, defendant points to newspaper articles appended to his motion for a new trial, as well as his claims of extensive television media coverage.

**{¶ 21}** This court has long-held that voir dire examination provides the best test as to whether prejudice exists in the community against a defendant in determining whether to grant a change of venue. *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 170-171. A review of the voir dire transcript indicates that the court and counsel questioned the members of the venire extensively to detect bias or anything that would prevent them from acting as fair and impartial jurors. At the outset, the prosecution quizzed prospective jurors as to whether they had heard or seen news reports of this case. After several prospective jurors indicated they had seen such reports, these same jurors were adequately interrogated about their ability to be fair to the defendant.

**{¶ 22}** Defendant cites *Brecheen v. Reynolds* (C.A.10, 1994), 41 F.3d 1343, 1351, for the proposition that a presumption of prejudice should arise where the totality of circumstances indicates that a defendant's trial was not fundamentally fair. However, as we noted in *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304, 313, cases where extensive pretrial publicity gives rise to presumed prejudice " 'are relatively rare. * * * [P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial.' *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683, 694-695."

**{¶ 23}** A review of the news articles appended to the defendant's motion for a new trial indicates that the pretrial publicity here was no more pervasive than that found in *Lundgren*, and there we found no abuse of discretion in the denial of a motion for a change of venue. *Id.,* 73 Ohio St.3d at 479-480, 653 N.E.2d at 313-

314. A careful review of the voir dire transcript here reveals no abuse of discretion by the trial court in denying the motion for a change of venue. Therefore, we reject proposition I.

*Lack of Funds for Experts*

{¶ 24} In proposition II, defendant contends that he was prejudiced by a lack of funds necessary to conduct an adequate defense. Specifically, defendant asserts that a lack of funds prevented him from hiring private independent expert witnesses to provide him with the basic tools of an adequate defense. Defendant argues that the trial court should have provided funds to enable him to hire a private independent investigator, an expert on Prozac, and an independent firearms or ballistics expert.

{¶ 25} R.C. 2929.024 authorizes trial judges to grant funds in aggravated murder cases for investigative services and experts when "reasonably necessary for the proper representation" of indigent defendants. Such decisions are vested "in the sound discretion of the [trial] court" based upon "(1) the value of the expert assistance to the defendant's proper representation * * * and (2) the availability of alternative devices * * * [to] fulfill the same functions[.]" *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. This court has recently held that "[d]ue process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial. (*State v. Broom* [1988], 40 Ohio St.3d 277, 533 N.E.2d 682, approved and followed.)" *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus.

**{¶ 26}** In addition, the United States Supreme Court has held that due process requires that an indigent defendant have access to psychiatric assistance "necessary to prepare an effective defense based on his mental condition, when his sanity at the time * * * [was] seriously in question." *Ake v. Oklahoma* (1985), 470 U.S. 68, 70, 105 S.Ct. 1087, 1090, 84 L.Ed.2d 53, 58.

**{¶ 27}** First, defendant never requested an independent, private investigator. Second, the trial court indicated on several occasions prior to trial that it was willing to consider appointing an expert witness on Prozac. However, the defense never made such a request. When the court appointed clinical psychologist Dr. Nancy Schmidtgoessling of the Community Diagnostic and Treatment Center as the defense mitigation specialist, the defense raised no objection. As a psychologist, Dr. Schmidtgoessling would have been able to testify as to issues involving Prozac. Third, the defense did not request an independent firearms expert when it had an opportunity to do so. Further, such expert testimony would have been irrelevant because the shootings were not in dispute.

**{¶ 28}** Thus, the defendant never preserved the issue. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156; *State v. Awan* (1986), 22 Ohio St.3d 120, 122, 22 OBR 199, 201, 489 N.E.2d 277, 279. Further, the defendant failed to make the particularized showings required by *State v. Mason.* Accordingly, we reject this proposition.

*Peremptory Challenges*

**{¶ 29}** In proposition VI, defendant argues that the trial court erred in overruling his motion for twelve peremptory challenges. We have ruled on this issue in the past and therefore summarily reject this proposition of law. See Crim. R. 24(C); *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, paragraph two of the syllabus; *State v. Carter* (1995), 72 Ohio St.3d 545, 555-556, 651 N.E.2d 965, 975.

*Verdict as Recommendation*

**{¶ 30}** Defendant complains in proposition XVII that the court and prosecutors erred during voir dire examination by advising jurors that a death verdict will be treated as a "recommendation" to the court. While no error is committed by the mere use of the word "recommendation," we prefer that courts trying capital cases include in jury instructions a statement similar to that commended in *State v. Mills* (1992), 62 Ohio St.3d 357, 375, 582 N.E.2d 972, 988, that, " '[s]imply put, you should recommend the appropriate sentence as though your recommendation will, in fact, be carried out.' " *Carter*, 72 Ohio St.3d at 559, 651 N.E.2d at 978. However, defendant failed to object to this; therefore, any error is waived, save plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 925. We find no plain error. Accordingly, we reject proposition XVII.

TRIAL ISSUES

*Manifest Weight/Sufficiency of Evidence*

**{¶ 31}** In proposition XVI, defendant asserts that the evidence is insufficient to sustain his convictions and, further, that his convictions are against the manifest weight of the evidence. Defendant fails to articulate anything to support his assertions beyond the legal standards applicable to such analysis.

**{¶ 32}** As we noted in *State v. Smith* (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668, 691, "[S]ufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally

sufficient as a matter of law to support the jury verdict, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546." The "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis *sic.*) *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d at 546.

{¶ 33} When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, after viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Jenks, supra*, 61 Ohio St.3d at 273, 574 N.E.2d at 503.

{¶ 34} The evidence supporting defendant's murder convictions was overwhelming, and defense counsel conceded during opening statement that defendant killed all three victims. The only disputed issue was whether prior calculation and design was proven. We find that it was.

{¶ 35} As to Kreamelmeyer, one Trans-Continental office worker testified that Kreamelmeyer had a heated conversation on the phone at the time defendant called Trans-Continental on December 15, and defendant acknowledged that Kreamelmeyer was angry with him and was not going to give him any work that day. The night before, defendant asked the chief dispatcher why Kreamelmeyer was "screwing him around." Prior to his confrontation with Kreamelmeyer, defendant went into the garage area and was told that his truck was ready, thus eliminating the lack of an available truck as a possible reason why Kreamelmeyer told him on the phone he was not going to give him a run that day. Defendant's claim that Kreamelmeyer "charged him" is not supported by any witness. In fact,

before the shooting began, several witnesses heard Kreamelmeyer yell for help, claiming he was being assaulted.

{¶ 36} After shooting Kreamelmeyer, the defendant sought out Kinney, another dispatcher at Trans-Continental who the defendant apparently believed had wronged him. Defendant shot Kinney twice in the chest and left him in the dispatcher's office to die.

{¶ 37} After firing two shots at both Kreamelmeyer and Kinney, defendant sought out Teetzel. Teetzel had pulled her chair in to make it appear she was not there as she hid under her desk. Looking under the desk and finding Teetzel, he moved her desk chair out of the way and fired a shot at her. He then left that part of the office, even though he saw Teetzel's office mate hiding under her own desk.

{¶ 38} Defendant admitted that he was upset over Trans-Continental's policy of delaying his pay if his paperwork was late. Moreover, defendant knew that Teetzel was the one who determined whether his paperwork was late, although he had never talked to her about it. Defendant asserts that there were no paychecks ready for him that morning, and that Kreamelmeyer told him to take the matter up with the office manager. Several witnesses stated that there were two checks ready for the defendant that morning, but there was no evidence that the defendant was aware of that fact.

{¶ 39} In addition, before going to the office that morning, defendant drank a beer and two shots of tequila and left for the office with a loaded gun in his pouch. While defendant asserted he had a gun with him that morning because he always carried one on him as "[a] lot of truck drivers do," rebuttal witness Lt. Jerome Gadzala of the Evendale police testified that defendant told him shortly after the murder that it was "highly, highly unusual for him to carry a gun to work."

{¶ 40} Defendant's murderous intent with prior calculation and design is reinforced by his encounter with Laurie McGuire on the second floor of the Trans-Continental office building. McGuire was literally running around in circles as

defendant climbed the stairs, fearing she would be the next victim.  However, when she came face to face with defendant, he told her, "I am not going to hurt you, [I am] only after the ones who screwed [me] over."  This is clear evidence that defendant was selectively choosing his victims and had the presence of mind to distinguish those who had not offended him.

{¶ 41} While there is no "bright-line test" emphatically distinguishing the presence or absence of prior calculation and design, *State v. Taylor* (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82, 89,  construing the evidence in a light most favorable to the prosecution, all three jury verdicts must stand.  The night before the murders, defendant asserted that Kreamelmeyer was "screwing him around."  While evidence of prior calculation and design in the murder of Kinney is not as readily apparent as it is with the Kreamelmeyer and Teetzel murders, several facts support this verdict as well.  Kinney worked as a dispatcher with Kreamelmeyer.  In addition, defendant displayed selectivity in shooting Teetzel, but not her office mate, Tonya Hinkle, nor Dana Jones and Evelyn Dinkgrave, who were close by.  As defendant told McGuire, who feared herself as the next victim, he wanted to shoot only those people who "screwed him over."  Therefore, the jury could reasonably find that defendant committed all three aggravated murders with prior calculation and design.  *Jenks, supra.*

{¶ 42} Defendant's claims of a Prozac-induced blackout or "fog" that prevented him from recalling the murders is simply not believable in light of all the evidence.  Defendant claimed to have blacked out when Kreamelmeyer allegedly charged him and claims not to have come out of his blackout until he was outside the building with the gun in his hand.  However, his cognitive ability to separate those who he believed had wronged him from those who he believed had not defies his claim.

{¶ 43} After reviewing the entire record, weighing the evidence and all reasonable inferences, we find that the manifest weight of the evidence also

supports defendant's convictions. Further, the quantum of evidence supporting his convictions is overwhelming. Accordingly, we reject proposition XVI.

## SENTENCING ISSUES

### *Sentencing Opinion*

{¶ 44} Under proposition V, defendant cites several errors in the trial court's sentencing opinion, which, he asserts, compel a reversal of his death sentence. First, defendant argues that the trial judge considered the nature and circumstances of the offense as an aggravating circumstance. Defendant contends that the court did not merely cite the nature and circumstances of the offense as reasons why the aggravating circumstance outweighed the mitigating factors, as permitted under *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598. Defendant claims that the court actually weighed the nature and circumstances of the offense against the mitigating factors.

{¶ 45} In *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 356, 662 N.E.2d 311, 322, we reiterated that when it comes to the actual weighing of the aggravating circumstances against the mitigating factors, the nature and circumstances of the offense may enter into the statutory weighing process only on the side of mitigation. See R.C. 2929.04(B). A review of the court's sentencing opinion reveals that it correctly identified the "course of conduct" specification to each murder count as the "aggravating circumstance." The trial court then listed all of the statutory mitigating factors set forth in R.C. 2929.04(B), including the nature and circumstances of the offense. The court summarized the nature and circumstances of the offense and concluded that "the proven facts of Aggravating Circumstances [*sic*] reveal a calculated, cruel, willful, and cold-blooded disregard for human life and values." The court then reviewed the mitigating evidence presented at trial, and concluded that the aggravating circumstance outweighed the factors in mitigation, and imposed the death sentence.

**{¶ 46}** Defendant argues that the foregoing language from the court's sentencing opinion indicates that the court converted the nature and circumstances of the offense into aggravating circumstances. We disagree. The court's opinion clearly indicates that the trial court understood the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense. See *State v. Sowell* (1988), 39 Ohio St.3d 322, 328, 530 N.E.2d 1294, 1302; *State v. Wiles* (1991), 59 Ohio St.3d 71, 90, 571 N.E.2d 97, 120; *State v. Rojas* (1992), 64 Ohio St.3d 131, 142, 592 N.E.2d 1376, 1386.

**{¶ 47}** When a court correctly identifies the aggravating circumstances in its sentencing opinion, we will presume that the court relied only on those circumstances and not on nonstatutory aggravating circumstances. See *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271, 279. Since the trial court correctly identified the course of conduct specification to each murder as "the aggravating circumstances [*sic*]," it is clear that the court in this case understood this distinction.

**{¶ 48}** Defendant next argues that the trial court's opinion considered the heinousness of the crimes as an "aggravating factor." However, we find no basis for such a conclusion. Moreover, even assuming that the defendant's argument has any legitimacy, our independent review will readily cure any such alleged error. *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304. Therefore, we overrule proposition V.

*Reasonable Doubt Standard*

**{¶ 49}** In proposition VIII, defendant submits that the statutory reasonable doubt standard of R.C. 2901.05 is inadequate and unreliable in capital cases. Defendant proposes that we adopt a standard requiring proof "beyond all doubt" as to whether death is an appropriate punishment. However, we have repeatedly rejected this same argument. See, *e.g., Jenkins,* 15 Ohio St.3d at 210-211, 15 OBR at 351, 473 N.E.2d at 304-305, and paragraph eight of the syllabus; *State v. Loza* (1994), 71 Ohio St.3d 61, 81, 641 N.E.2d 1082, 1104.

*Victim Impact Testimony*

{¶ 50} In proposition XIV, defendant asserts that the trial court considered and weighed victim impact testimony at the sentencing hearing as an improper aggravating circumstance. Defendant contends that such testimony contributed to a "lynch mob mentality in the Courtroom."

{¶ 51} The testimony defendant complains of took place at the sentencing hearing, after the jury was discharged, but before the trial court rendered its sentence. The prosecutor asked the court whether two of the victims' family members could address the court, and stated, "I understand it can't be part of your verdict or findings, but I think it would be helpful to them." The court then permitted the brothers of both Kinney and Kreamelmeyer to testify. The testimony of Kinney's brother presented nothing out of the ordinary, but Kreamelmeyer's brother passionately urged the court to sentence defendant to death, going so far as to say that "[Clemons] should be tried and executed within four weeks of this murder and rampage." At the end of this testimony, the trial court stated that "the law does not permit the Court in making this particular finding to consider the statements made by families of the victims."

{¶ 52} Given the trial judge's affirmative declaration that he would not consider this testimony, we are guided by the presumption that the trial judge considered only relevant, material, and competent evidence in arriving at his judgment to impose the death sentence on defendant. *State v. Dennis* (1997), 79 Ohio St.3d 421, 433, 683 N.E.2d 1096, 1107. As in *Dennis*, a careful review of both the transcript and sentencing opinion reveals no inference or suggestion that the trial judge considered victim impact testimony. Accordingly, we overrule proposition XIV.

*Rebuttal Testimony*

{¶ 53} In proposition XV, defendant claims error in permitting the state to present expert rebuttal evidence on the effects of Prozac. Defendant asserts that he

was prejudiced, since the defense neither raised an insanity defense nor alleged that Prozac caused the murders.

**{¶ 54}** During his trial phase testimony, defendant stated his belief that his taking of Prozac caused him to black out before the murders. At the mitigation hearing, defendant's mother testified that there was a difference in defendant's behavior after he started taking Prozac: "He laughed at things that I didn't even think was funny, but he laughed at them." Defendant's physician testified that he had treated defendant's depression with Prozac.

**{¶ 55}** Prior to having defendant read his unsworn statement at the mitigation hearing, the defense moved to readmit all of the defense testimony from the trial phase. In *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus, we held that "counsel for the state at the penalty stage of a capital trial may introduce * * * (1) any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, (2) any other testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty, (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant * * *." See, also, *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus.

**{¶ 56}** The expert rebuttal testimony offered by the prosecution on the effects of Prozac was introduced to rebut defendant's trial testimony that he believed that the drug made him black out at the time of the murders. The expert testified in rebuttal that Prozac is an antidepressant that reduces aggressive behavior and suicidal thoughts in people. The defense strategy apparently was to introduce the Prozac issue frequently to keep it in the jury's consciousness. The rebuttal testimony was relevant to rebut this inference. Accordingly, we reject proposition XV.

16

INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶ 57}** Defendant asserts in proposition III that trial counsel were ineffective in permitting him to be examined by the court psychiatric center. He alleges that counsel also erred in allowing a report of the center's findings to be submitted to the trial court. While defendant concedes that the defense's mitigation expert never testified, he contends that the trial judge heard a summary of such "incredibly damning evidence" pursuant to the judge's ruling on a discovery motion. Defendant suggests that this report contributed to the trial judge's decision to sentence him to death.

**{¶ 58}** Reversal of a conviction on the grounds of ineffective assistance requires "[f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial * * *." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. However, defense counsel's performance was not deficient. Moreover, defendant has not demonstrated prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

**{¶ 59}** After his indictment, defendant entered a plea of not guilty by reason of insanity. Dr. Nancy Schmidtgoessling of the Community Diagnostic and Treatment Center was appointed as defendant's mitigation specialist. Subsequently, upon assessing the doctor's report, defense counsel determined that the insanity plea was not viable in this case, although counsel indicated that they were still actively pursuing a "Prozac defense." Due to the unfavorable findings Dr. Schmidtgoessling made in her report, defense counsel chose not to submit her

report to the jury. Although the prosecution considered calling Dr. Schmidtgoessling as a rebuttal witness at the mitigation hearing, it did not do so.

{¶ 60} In our view, defendant's assertions under this proposition of law are nothing more than a second guess. Counsel could not reasonably foresee that the mitigation report would produce information so damaging to defendant that they would have little choice but to forgo presenting the mitigation expert's report to the jury. In deciding not to use the report, defense counsel were able to keep the damaging information away from the jury. Counsel's actions in this regard did not fall below an objective standard of reasonable representation, nor did prejudice arise. *Bradley,* at paragraph two of the syllabus.

{¶ 61} Defendant's argument that it was ineffective assistance because the trial judge heard the damaging evidence is also meritless. A trial judge is presumed to have considered only relevant, material, and competent evidence in arriving at a judgment, unless the record affirmatively indicates otherwise. See *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759; *State v. Davis* (1992), 63 Ohio St.3d 44, 48, 584 N.E.2d 1192, 1196. Nothing in the record or in the trial court's sentencing opinion indicates that the trial judge relied on matters not in evidence so as to support a claim of ineffective assistance of counsel. See *State v. Allard* (1996), 75 Ohio St.3d 482, 489-491, 663 N.E.2d 1277, 1285-1287.

{¶ 62} Last, defendant contends that counsel were ineffective in failing to remove the cause to another venue. The record does not support this claim. Initially, counsel moved for a change in venue, but the motion was properly held in abeyance pending completion of voir dire of the jury. At the close of voir dire, defense counsel again asserted the venue motion, and the motion was then denied by the trial court. Contrary to defendant's intimations, trial counsel did attempt to get venue changed. It cannot be ineffective assistance merely because the trial judge did not grant the motion. We have already found that pretrial publicity in this case did not warrant a change of venue. Therefore, we overrule proposition III.

PROSECUTORIAL MISCONDUCT

{¶ 63} In proposition IV, defendant claims that he was denied a fair trial due to prosecutorial misconduct during the opening and closing arguments at the guilt phase, and closing argument at the penalty phase. The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15, 14 OBR 317, 319, 470 N.E.2d 883, 885.

{¶ 64} The first group of comments defendant cites occurred during opening statement: (1) that defendant came to work "prepared for a slaughter"; (2) that defendant looked at Kinney, who was at his desk "defenseless, helpless and just sitting there"; (3) that defendant shot Kreamelmeyer "in such a cowardly fashion" in the back while he lay there dying, and "Could you even imagine the abject terror of those women who have just witnessed it and heard these gunshots[?]"; (4) that defendant had done his "errand for the day"; and (5) that defendant "in an incredible act of cowardness [*sic*] purposely killed three innocent helpless people * * * [a]nd he would have killed more. He would have killed others if he could find out the ones who screwed him over."

{¶ 65} Comments two and three were objected to, but the remaining three are waived. *Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d at 924-925. The terms "cowardly" or "cowardness" are no worse than characterizations we have found permissible in other cases. See, *e.g., State v. Brown* (1988), 38 Ohio St.3d 305, 316-317, 528 N.E.2d 523, 538 ("monster"); *State v. Wickline* (1990), 50 Ohio St.3d 114, 121, 552 N.E.2d 913, 921 ("Nazi"). Moreover, shooting someone in the back, as defendant did Kreamelmeyer, is an almost universally recognized act of cowardice. We find that comments two and three were within the bounds of opening statement and were a fair commentary on the facts. Further, none of the remaining comments constitutes outcome-determinative plain error. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

{¶ 66} In closing argument at the guilt phase, defendant complains of four improper comments: (1) "[T]his twisted, cowardly act of vengeance"; (2) "[The defendant] had to testify. Do you know why he had to testify? He had to testify because otherwise there would have been absolutely no evidence that he went in there that day for work. None. Not a speck of evidence. The defendant has to testify."; (3) "But even though he testified with this ridiculous thought he had to work that day, he was proven a liar yesterday and proven a liar today."; (4) "I know the defense attorneys are just doing their job, but if there is any hope at all that they could produce any type of expert to say this defendant blacked out and could not form the requisite intent of purposely killing these people, you would have heard it."

{¶ 67} The first three comments are waived for lack of an objection. *Slagle.* Plain error is also absent. *Long.* Terms such as "coward" and "liar" may be harsh, but fall short of being "purely abusive." *Brown*, 38 Ohio St.3d at 317, 528 N.E.2d at 538. Referring to defendant as a "liar" was improper, in that it conveyed to the jury the prosecutor's personal belief. *State v. Watson* (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97, 106. However, here, the prosecutor's characterization was marginally permissible, since the opinion was based on the evidence presented at trial. *State v. Tyler* (1990), 50 Ohio St.3d 24, 40-41, 553 N.E.2d 576, 595-596. Since the state was trying to prove that defendant went to work with the intent to kill, the prosecutor's comment underscores the state's theory of the case that defendant's version of what happened was contradicted by the evidence.

{¶ 68} Although it is error for a prosecutor to comment on a defendant's failure to testify, see *State v. Thompson* (1987), 33 Ohio St.3d 1, 4, 514 N.E.2d 407, 411, the comment that defendant had to testify appears to be fair comment based on the evidence and within the latitude accorded the prosecution during closing argument. *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566. The comment that the defense did not call an expert to testify

20

that defendant "blacked out" during proceedings is not error. The comment that a witness other than the accused did not testify is not improper, *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 193, 616 N.E.2d 909, 916, since the prosecution may comment upon the failure of the defense to offer evidence in support of its case. *State v. Williams* (1986), 23 Ohio St.3d 16, 19-20, 23 OBR 13, 16-17, 490 N.E.2d 906, 910-911; *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754, 760.

{¶ 69} Nevertheless, the prosecutor's prefacing statement that "I know the defense attorneys are just doing their job" was improper, since it imputed insincerity to defense counsel by suggesting that they believed that defendant was guilty. *Keenan, supra*, 66 Ohio St.3d at 405-406, 613 N.E.2d at 206-207. While defense counsel conceded at the outset of trial that their client was guilty, they still maintained that prior calculation and design, necessary to support a capital offense conviction, was not proven. Thus, the prosecutor's prefacing comment was improper. See *Berger v. United States* (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321. However, given the abundant evidence of defendant's guilt of aggravated murder with prior calculation and design, this error was harmless in that it was not outcome-determinative.

{¶ 70} Defendant next contends that he was prejudiced by the prosecutor's comments during closing argument at the penalty phase. First, defendant cites the prosecutor's "challenge" to defense counsel to look at each juror in the face and convince them that the mitigating factors the defense presented "come close to outweigh or be more important than the lives of those three people." While this comment was highly theatrical and, when viewed in isolation, improper, it did not materially prejudice defendant. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 41, 630 N.E.2d 339, 345. Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight. *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292, 309. In any event,

defense counsel specifically and effectively answered the prosecutor's challenge by stating that he was accepting it, and asking the jury to spare defendant's life.

{¶ 71} Next, defendant essentially complains that the prosecutor denigrated defense counsel by arguing that the basic message of the defense to the jury is "to ignore your orders, don't follow the law, do what you want to do." This overly embellished comment borders on impropriety, but was neither outcome-determinative nor unduly prejudicial. The fact that defense counsel told the jury that they could "make up your own minds" on the death sentence, even if the aggravating circumstance outweighed the mitigation beyond a reasonable doubt, suggests that the prosecutor's comment was truthful.

{¶ 72} The third penalty phase closing argument comment cited by defendant was that the prosecutor told the jury, "[Y]ou have been subjected to a whole variety of issues that were simply presented to you for sympathy purposes." This comment, which could be regarded as an expression of personal belief by the prosecutor, or even a slight denigration of defense counsel, was permissible, since it was based on the evidence presented during the penalty phase. See *State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674, 684. Further, it was proper to point out to the jurors that their sympathy is irrelevant to their duty as jurors. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212, 217.

{¶ 73} Defendant next cites two comments that the prosecutor made concerning the defense's failing to call certain witnesses to testify. One involved the failure to call an expert to testify that defendant suffered from depression. The other was a rhetorical question, asking why defendant never called any of his former bosses to testify on his behalf at the mitigation hearing. As mentioned earlier, comments that a witness other than the accused did not testify are not improper.

{¶ 74} Defendant also claims error where the prosecutor commented, "You remember the evidence you heard and I suspect I will be continually interrupted

22

throughout this closing argument. It's kind of a tactic defense attorneys are taught." This comment improperly denigrated defense counsel and has no place in a trial. In our view, such prosecutorial comments potentially infringe on the defendant's right to counsel and penalize him for attempting to enforce procedural rights. *Keenan,* 66 Ohio St.3d at 406, 613 N.E.2d at 207. However, the improper comment appears to be harmless in light of all the evidence, and did not prevent defendant from obtaining a fair sentencing, as it was not outcome-determinative.

{¶ 75} In sum, defense counsel objected to most of the comments defendant complains of, but the trial court issued curative instructions that the arguments of counsel do not constitute the law or evidence in the case. While many of these prosecutorial comments were embellished, and some were improper, they fall short of the excessiveness we found prevalent in *Keenan*, and were not outcome-determinative. Nevertheless, prosecutors should be on notice to avoid the comments highlighted here. Cf. *Keenan,* 66 Ohio St.3d at 410-411, 613 N.E.2d at 210. Proposition IV is overruled.

CONSTITUTIONALITY

{¶ 76} In proposition IX, defendant asserts that the Ohio death penalty review process is unconstitutional in removing courts of appeals from the appeal process. However, we rejected these arguments in *Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, syllabus.

{¶ 77} In propositions VII, X, XI, XII, and XIII, defendant raises other constitutional challenges to the death penalty statutes. But we have rejected these same arguments in numerous cases. See, *e.g., Jenkins*, 15 Ohio St.3d at 168, 15 OBR at 314-315, 473 N.E.2d at 273; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, syllabus; *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633-634; *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972; *State v. Buell* (1986), 22 Ohio St.3d 124, 138, 22 OBR 203, 215, 489 N.E.2d 795, 808; *State v. Evans* (1992), 63 Ohio St.3d 231, 253-254, 586 N.E.2d 1042, 1059. See, also, *Blystone v. Pennsylvania* (1990), 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255. Accordingly, all of defendant's constitutional challenges are overruled.

INDEPENDENT SENTENCE EVALUATION

{¶ 78} After independent assessment, we find that the evidence supports beyond a reasonable doubt the aggravating circumstance that defendant murdered Kreamelmeyer, Kinney, and Teetzel as part of a course of conduct involving the purposeful killing of two or more persons. R.C. 2929.04(A)(5).

{¶ 79} The nature and circumstances of the offense provide nothing in mitigation. On the morning of December 15, 1995, defendant phoned his employer and got into a heated conversation with dispatcher Kreamelmeyer. Shortly thereafter, defendant armed himself with several firearms, drank a beer and two shots of tequila, and went to the offices of Trans-Continental in Evendale.

{¶ 80} Upon encountering Kreamelmeyer, defendant punched him, took out a gun, and fired two shots at both him and another dispatcher, Kinney. Defendant

then sought out Teetzel, whom he found hiding under her desk. He pulled out her desk chair and shot her once but did not shoot her co-worker. Defendant then proceeded to the second floor offices, apparently looking for the office manager. When he encountered an office worker who feared that she would be the next shooting victim, defendant told her he would not harm her. He declared that he "was only after the ones who screwed him over." In addition, defendant testified that when the shootings were over, he walked out to the front of the building. He testified that he chose the female officer to surrender to in order to avoid getting slammed to the ground.

{¶ 81} Defendant's version of the events that he came in for work that day looking to get a load to deliver and pick up his paycheck, and then went into a "fog" after Kreamelmeyer supposedly charged at him, totally lacks credibility, given all the other evidence and testimony adduced at trial.

{¶ 82} Defendant's history, character, and background provide some mitigating features. Defendant, fifty-four years old at the time of trial, was the second child of his parents, but had limited contact with his father, at first, because of World War II, and then because his parents were divorced around 1948. After his mother remarried, defendant was never really on speaking terms with his stepfather, who instructed defendant not to call him "daddy." Defendant played the saxophone in his school marching band and married his high school sweetheart after graduation. Soon after high school, he voluntarily joined the Army, served overseas, and was later honorably discharged. A few years after moving the family to Florida, defendant divorced his wife, and she apparently obtained custody of their two daughters.

{¶ 83} Defendant's work history was varied. He managed a Frisch's restaurant and moved the family to Florida to help save a Frisch's franchise that was on the verge of bankruptcy. Defendant worked in various jobs and ran a few businesses in the succeeding years. He moved back to Cincinnati at the time his

mother underwent heart bypass surgery and had been very helpful to her in the years prior to the murders. While back in Cincinnati, defendant sold carpeting for several years, then enrolled in a training course to learn how to drive a semi-trailer.

{¶ 84} Defendant suffers from depression, and has been taking Prozac for his condition since March 1994. He also had a history of drug abuse and cocaine abuse, which he stopped approximately five years before the murders. Defendant has a scar on his neck from a failed suicide attempt in the past.

{¶ 85} Dr. James Day testified on defendant's behalf as his personal physician. Dr. Day prescribed Prozac to defendant to combat his depression, but did not suggest he undergo group therapy. Dr. Day also treated several other medical conditions for defendant, including high blood pressure.

{¶ 86} Defendant's mother, Alice McMichen, also testified on his behalf. Her testimony basically chronicled defendant's life history. She testified that defendant had been a good son to her and was always kind to her. McMichen believes that defendant should be punished for his crimes, but asked the jury to spare his life, since she believed that defendant is not "that bad a person."

{¶ 87} Defendant gave an unsworn statement in which he apologized for the murders, but acknowledged that an apology is "not enough." Defendant stated that "[t]he horrible, ugly person that I became last December 15th is not Gerry Clemons. It is not me." Defendant mentioned that he had endured many nightmares of horror about what he did, and reiterated his sorrow for the crimes he committed. While affirming that he "must be punished," defendant pleaded to the jury, "Please, don't think I don't care and I am not truly sorry for my loss of control or that I could give my own life to change the hurt. Now I can only say that the sorrow, the shame and remorse that I have and I have put on my family will be with me forever."

{¶ 88} With regard to the statutory mitigating factors of R.C. 2929.04(B), defendant's lack of a criminal record is entitled to significant mitigating weight.

See *State v. Brewer* (1990), 48 Ohio St.3d 50, 64, 549 N.E.2d 491, 504. Other factors entitled to weight in mitigation include defendant's depression for which he was being treated with Prozac. His service in the Army, from which he was honorably discharged, is also mitigating. *Lundgren, supra*, 73 Ohio St.3d at 495, 653 N.E.2d at 324. In addition, defendant's expressions of remorse and sorrow are entitled to mitigating weight. *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, 1387. Defendant's cooperation with police after his arrest is only marginally mitigating, as his cooperation is suspect for the reasons stated above. *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988, 998.

**{¶ 89}** Nevertheless, after independent weighing in each of the three murders, we conclude that the aggravating circumstance in each murder outweighs the mitigating factors beyond a reasonable doubt. Defendant deliberately sought out and murdered each victim without provocation. Defendant's course of murderous conduct merits the capital penalty to which he was sentenced.

**{¶ 90}** The death sentences imposed in this case are neither excessive nor disproportionate when compared with similar cases of murder as a course of conduct involving the purposeful killing of two or more persons. *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245, involved a former employee killing two former co-workers and a failed attempt to kill a third. It also presented arguably more mitigating factors than the instant case (nineteen-year-old offender; lack of a significant criminal history; conduct disorder), and the death sentence was upheld. *Lundgren*, 73 Ohio St.3d 474, 653 N.E.2d 304, also arguably contained more factors in mitigation (difficult childhood, honorable discharge, personality disorder, lack of a significant criminal record), yet the death penalty was affirmed in that case as well. Imposing the death sentence in this case is both appropriate and proportionate.

**{¶ 91}** Therefore, we affirm defendant-appellant's convictions and sentences, including the death sentence.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

_____