OPINION
On April 25, 2000, Jeanette Jackson and her sister, Anitra Jackson, left at approximately 11:30 p.m. to go to a club. On the way, they dropped off their children, Jeanette's one-year-old son Carlos and Anitra's three-year-old son Allister with Defendant-Appellant Charles Martin to babysit. Martin is also Carlos' father. However, Martin and Jeanette evidently were no longer involved in a relationship. At around 2:30 a.m., Anitra and Jeanette left the club together, followed by Marcus, the bartender from the club. They dropped off a friend at her home and proceeded to Anitra's house at 1055 Salem Avenue. Jeanette and Marcus then left together. Anitra went to sleep in her bedroom.
At about 3:15 a.m., Martin called Anitra and asked where Jeanette was, complaining that his six-year-old son Dominic was having an asthma attack. Anitra informed him that she did not know Jeanette's whereabouts. She hung up the phone and went back to sleep. The next thing Anitra remembered was Jeanette jumping on her bed exclaiming, "he's got a gun." Immediately thereafter, Martin walked into the room holding a gun.
Upon entering the bedroom, Martin stated that "he had time to think about how he was going to do it," that he was going to kill them. Martin told them that, because they liked to be together so much, they were going to die together. Then he yanked the phone out of the wall and threw the cordless phone into the toilet. Martin explained that he was upset about them laughing at him and about Jeanette being with Marcus, among other things. At this time, he began dumping out purses, yanking off their jewelry, and going through dresser drawers. Martin told the women he was going to make it look like a robbery. After finding no money in Anitra's purse, Martin rummaged through her dresser drawers and found $240, which he put in his pocket.
During this process, Martin attempted to pull two rings off Jeanette's fingers and became upset when they would not come off. Anitra then jumped out of bed, ran to the doorway, and told him "he was going to do what he was going to do." Martin said to Anitra, "You know what, Jackson? I never did like you." He then shot her in the chest. Even after being shot, Anitra lunged at Martin and wrestled with him in an attempt to grab the gun. Jeanette tried to break them up. After the struggle, Anitra fell to the floor, and Jeanette applied pressure to Anitra's gunshot wound with a shirt to stop the bleeding.
While Jeanette was tending to Anitra's wound, Martin stated that "he wanted to think about something while he was in jail." He instructed Jeanette to perform cunnilingus on her sister. When she refused, he put the gun to her head and forced her. While this was happening, Martin forced Anitra to perform fellatio on him. He then forced Anitra to perform cunnilingus on Jeanette.
After a while, Anitra told Martin she had to use the restroom. He finally allowed her to go. As she entered the restroom, which was attached to the bedroom, she saw Martin grab a blue pillow and throw Jeanette on the bed. While she was in the bathroom, Anitra overheard Jeanette begging him not to "do it." She stated, "Don't do this. What about the kids?" In response to this question, Martin told Jeanette that he was going to shoot Carlos in the head. Soon after, Anitra pushed open the window and climbed out, running out onto Salem Avenue screaming for help. The time was approximately 6:00 a.m.
As Anitra was running across Salem Avenue, she attempted to enter a van, but the van drove away. At that moment, she saw Martin behind her, firing the gun. He yelled, "you must die, bitch." One shot penetrated her back, and she fell to the ground. As this happened, two vehicles came to a stop in the southbound lanes of Salem Avenue. These two motorists witnessed what transpired next.
According to Anitra, Martin fired two shots while she lay on the ground, one penetrating her hand and the other her shoulder. When he tried to fire a third time, the gun jammed. Both witnesses testified that Martin had fired the gun once while she was on the ground and that the gun jammed the second time. Mr. Davis, the witness in the right lane, testified that Martin had cleared the gun to fire a third time and that the gun had jammed again. At that point, Martin ran off, heading northbound back up Salem Avenue. Ms. Muhammed, the witness in the left lane, testified that she had been screaming when Martin fired at Anitra the first time and had continued to scream the whole time he was in front of her car. Ms. Muhammed claimed that, while she was screaming, Martin had looked at her and raised the gun, but that the gun had jammed. He then ran off.
After Martin ran away, Ms. Muhammed backed up and drove around Anitra to a gas station on Salem to get the police. Mr. Davis, on the other hand, while watching Martin run away, heard a knock on his driver's side window. He turned to see Anitra standing there. Mr. Davis unlocked his door and allowed Anitra to climb into his truck. They drove to the police station while he held onto the door with his hand because it would not close with Anitra sitting to his left.
Once they arrived at the police station, Mr. Davis flagged down some officers to tend to Anitra. She told the officers that Martin had shot her and that her sister was being held hostage at her residence. Anitra was then taken to the hospital.
In the meantime, Ms. Muhammed also arrived at the police station, and both Mr. Davis and Ms. Muhammed were questioned by police. When shown a photo spread containing Martin's picture, Mr. Davis picked out two potential suspects, neither of which were Martin. Ms. Muhammed, on the other hand, picked Martin out of the spread. She also testified at trial that she would never forget his face.
When the police arrived at Anitra's residence, they found Jeanette's body lying partially on the bed, with her lower body hanging off. She had a pillow over her face with a hole in it. Jeanette had been shot through the pillow into her right temple. The bullet had then exited behind her left ear, and gone through the bed and the floor. It was recovered inside the furnace in the basement. An officer testified that there had still been signs of life when they first discovered Jeanette, but she died shortly thereafter.
The police arrested Martin later that day at his home, where he was found with the three children, Dominic, Carlos, and Allister. Martin was indicted on four counts of murder, four counts of attempted murder, four counts of rape, and one count each of aggravated burglary and aggravated robbery. During the trial, the court dismissed one count each of murder and attempted murder and the aggravated burglary charge. The jury convicted Martin of the remaining eleven counts, as well as five firearm specifications.
After the three remaining murder counts and the three remaining attempted murder counts were merged into one count of each, Martin was sentenced to life for aggravated murder, ten years for attempted murder, ten years for aggravated robbery, ten years each for the four rape counts, two consecutively and two concurrently. Aside from what was specified for the rape counts, all sentences were to be served consecutively, including the five firearm specifications. The total sentence amounted to life plus fifty-five years. Martin has now appealed, raising the following assignments of error:
 I. Whether there was sufficient evidence to support the appellant's conviction or, alternatively, whether the verdict was against the manifest weight of the evidence.
 II. Whether the court erred when it sentenced appellant to maximum and consecutive prison terms without prior notice of enhancing factors in the charging instruments and proof beyond a reasonable doubt and thereby violated his constitutional right to due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I Section 10 of the Ohio State Constitution.
 I
In his first assignment of error, Martin actually makes two separate arguments. First, he claims that his convictions were not supported by sufficient evidence. When an appellant alleges insufficiency of the evidence, the court must determine whether the evidence is "legally sufficient as a matter of law to support the jury verdict." State v. Clemons (1998), 82 Ohio St.3d 438, 444 (citations omitted). An appellate court's function when presented with this question "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. More specifically, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
Martin was indicted on a total of fourteen counts. He was indicted on four counts each of murder and attempted murder: for prior calculation and design, for felony murder while committing rape, for felony murder while committing aggravated robbery, and for felony murder while committing aggravated burglary. Further, he was indicted on one count of aggravated burglary, one count of aggravated robbery, and four counts of rape: two counts of cunnilingus regarding Jeanette, and one count of fellatio and one count of cunnilingus regarding Anitra. Following the state's case, the trial court sustained Martin's motion for a Crim.R. 29 motion with regards to the aggravated burglary count, as well as the murder and attempted murder while committing aggravated burglary. As to the other eleven counts, we find that the evidence was sufficient to support the convictions.
Martin argues that there were several inconsistencies in the evidence, primarily in Anitra's testimony. While it may be true that there were minor inconsistencies, Anitra's testimony established every element of every crime Martin was convicted of, except for the aggravated murder charges regarding Jeanette. Although Anitra did not actually witness Martin shooting Jeanette, she did see him pick up the pillow and throw her on the bed. Anitra overheard her sister begging him not to "do it." Then, seconds after climbing out the window and running from the house, Anitra saw Martin chasing her and shooting at her. A very short time later, Jeanette's body was found with the blue pillow over her face. Furthermore, the firearms expert testified that all of the spent casings found at the scene, including the bullet that killed Jeanette and others that had been fired at Anitra, were fired from the same gun. Viewing this evidence in a light most favorable to the prosecution, we find that it was sufficient to support all of Martin's convictions.
A conviction supported by sufficient evidence may still be reversed if the reviewing court concludes that the conviction was against the manifest weight of the evidence. State v. Thompkins (1997),78 Ohio St.3d 380, 387. When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. A verdict should only be overturned in extraordinary situations when evidence weighs heavily against the conviction. Id.
After reviewing the entire record, we do not find that the jury clearly lost its way. Anitra had known Martin for several years. He was the father of her sister's child. There is virtually no chance of mistaken identity. She told the officers immediately that Martin was responsible for these crimes. Moreover, Ms. Muhammed, the motorist who witnessed at least one shot fired into Anitra, identified Martin in a photo spread. Although it was likely still dark at the time Ms. Muhammed saw this occur, she testified that he had been standing directly in the beam of her headlight.
Martin contends that the testimony was against the manifest weight because most of the counts relied completely on Anitra's testimony. Part of our role in a manifest weight assignment of error is to weigh the credibility of witnesses. We found no issues with Anitra's credibility. Anitra described on the stand all of the events of that morning, from beginning to end. Within that testimony, she explained that Martin had rummaged through her drawers and had put $240 in his pocket, substantiating the aggravated robbery charge. She also testified that he had pulled jewelry off of them and dumped purses on the floor. This evidence was found at the scene. Anitra further described the incidents of rape that Martin had forced her and Jeanette to endure. This testimony was corroborated by the fact that both victims were wearing no clothes from the waist down, as well as by the undergarments and pajama bottoms found on the floor of her bedroom. Finally, she recounted each of the four times that Martin had shot her. Moreover, she relayed his words: he was there to kill them, they were going to die together, and "you must die, bitch." And again, although she did not witness her sister's shooting, the testimony given by Anitra, combined with the ballistics evidence, was enough for a reasonable jury to infer that Martin also shot and killed Jeanette.
Based on the foregoing, we find that the evidence was sufficient to support all of Martin's convictions; and further, the convictions were not against the manifest weight of the evidence. Martin's first assignment of error is overruled.
 II
In his second assignment of error, Martin challenges his sentence under several different theories. We find that one of these theories has merit. Martin alleges that the trial court failed to make findings and explain its reasons for sentencing him to maximum and consecutive sentences. We agree.
R.C. 2929.14(C) provides that a court may impose maximum sentences only upon (1) the offenders who have committed the worst form of the offense; (2) the offenders who pose the greatest likelihood of recidivism; (3) certain major drug offenders; and (4) certain repeat violent offenders. In relation to this section, R.C. 2929.19(B)(2)(e) requires a court to "make a finding that gives its reasons" for imposing the maximum prison terms for more than one offense.
In addition, R.C. 2929.14(E)(4) states that a court may only impose consecutive sentences if the court finds: (1) "consecutive service is necessary to protect the public from future crime or to punish the offender," (2) "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and (3) "one of the following:"
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a [community control] sanction * * *, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crimes by the offender.
Again, R.C. 2929.19(B)(2)(c) requires the court to make findings and state its reasons for imposing consecutive sentences.
The supreme court has addressed the requirements in R.C. 2929.19(B)(2) and found that the sentencing record must reflect the trial court's findings and reasons therefore. State v. Edmonson (1999),86 Ohio St.3d 324, 328-29. If those findings and reasoning were not part of the record, the case must be remanded for resentencing. Id. at 329.
During Martin's sentencing hearing, the trial court stated as follows:
 Now, with respect to those sentences which the Court has imposed the maximum prison term, the Court's finding is that the offenses committed were the worst form of those offenses and you pose a great likelihood with respect to these cases of committing future offenses. These findings are also made with respect to all other counts with respect to the Court's sentence in this matter.
 The Court is going to order these sentences and the sentences that I'm about to impose served consecutively with each other.
 Consecutive sentences are found by the Court to be necessary to punish adequately the offender and that the sentences are not disproportionate to the seriousness of the offender's conduct and that the harm that was caused was so great or unusual that no single prison term can adequately reflect the seriousness of the conduct that you engaged in.
Clearly, the court virtually quoted the statutory language in R.C.2929.14(C) to justify the maximum sentences and R.C. 2929.14(E)(4) to justify the consecutive sentences. Technically, therefore, the court made the findings required by statute. However, "the record must contain some indication, by use of specific operative facts, that the court considered the statutory factors in its determination." State v. Finch (1998),131 Ohio App.3d 571, 574. The trial court did not state any factual reasons to support its findings that maximum and consecutive sentences were warranted. It was required to do so by R.C. 2929.19(B)(2). As a result, the case must be remanded for resentencing.
We would like to stress, however, that we are not suggesting that the trial court's sentences were unsupported by facts in the record. Instead, we find that the law requires the trial court to recount those specific facts in the record that support the maximum and consecutive sentences imposed. Having said that, we should also point out that a new inquiry must be conducted by the trial court on remand. In this regard:
 [T]he trial court should first reexamine the evidence presented in this case and then impose appropriate sentences for [all] counts by applying the correct statutory factors, making the necessary findings, and expressly stating its reasons for imposing such sentences on the record. The trial court should not simply make a finding on the record to support the imposition of its original [maximum and consecutive] sentences * * *. Instead, the trial court needs to redetermine what the appropriate sentences for [all] counts should be and then state its reasoning for such conclusion on the record. We do not mean to suggest, however, that the trial court is precluded from reimposing the original sentences if, upon proper analysis, it remains convinced that they are appropriate.
State v. Johnson (May 11, 2001), Montgomery App. No. 18383, unreported at p. 3.
Before remanding, we need to briefly address one of Martin's other arguments under this assignment of error. Martin argues that the sentence imposed constituted a penalty for failing to accept the plea offer. We find no evidence of this. The plea offer consisted of pleading to one count each of aggravated murder and attempted aggravated murder and one firearm specification. All other counts would be dismissed. Although it is not clear from the record, Martin claims that, under this offer, he would have had the opportunity to be released from prison in as early as thirty-three years. After his trial, Martin was convicted of eleven counts and five firearm specifications. Naturally, the total sentence would be longer due to the aggravated robbery conviction, the four rape convictions, and the additional firearm specifications. Further, the court was able to gain a fuller appreciation of the details of the crimes during the trial than may have been available before. See, e.g., State v. Mitchell (1997), 117 Ohio App.3d 703, 707. Consequently, there is no evidence that the court imposed the sentences as a penalty for failing to accept the plea offer.
All other arguments made by Martin under this assignment of error are rendered moot by the remand. Based on the foregoing, Martin's second assignment of error is sustained in part and overruled in part.
Accordingly, all of Martin's convictions are affirmed, but we remand for resentencing consistent with R.C. 2929.14 and 2929.19(B).
GRADY, J., and YOUNG, J., concur.