The STATE of Ohio, Appellee,

v.

KING, Appellant.

[Cite as *State v. King* (1989), 63 Ohio App.3d 183.]

Court of Appeals of Ohio,
Lucas County.

No. L–87–392.

Decided June 9, 1989.

*Anthony G. Pizza,* Prosecuting Attorney, *James D. Bates* and *Louis E. Kountouris,* Assistant Prosecuting Attorneys, for appellee.

*John F. Potts,* for appellant.

ABOOD, Judge.

This cause is before the court on appeal from a judgment of the Lucas County Court of Common Pleas, in which defendant-appellant, James R. King, was found guilty of aggravated murder while in the commission of a kidnapping, in violation of R.C. 2903.01(B) and one specification in violation of R.C. 2929.04(A)(7).

Appellant sets forth the following assignments of error:

"I. The appellant's conviction for aggravated murder is unsupported by the evidence in that there was insufficient proof that appellant had acted with purpose to kill. .

"II. The appellant's conviction for aggravated murder is against the manifest weight of the evidence in that there was not adequate proof that appellant had acted with purpose to kill.

"III. Appellant's conviction for aggravated murder is violative of his right to due process of law in that no rational trier of fact could reasonably have concluded that purpose to kill had been established by proof beyond reasonable doubt as is constitutionally required.

"IV. The appellant's conviction on the kidnapping specification is unsupported by the evidence.

"V. The appellant's conviction on the kidnapping specification is against the manifest weight of the evidence.

"VI. The appellant's conviction on the kidnapping specification is violative of his right to due process of law in that no rational trier of fact could have reasonably concluded that the commission of a kidnapping had been established by proof beyond a reasonable doubt as is constitutionally required.

"VII. It constituted error for the trial court to deny appellant's motion to dismiss the kidnapping specification.

"VIII. It constituted error to deny appellant's motion for a new trial."

The undisputed facts giving rise to this appeal are as follows. On the evening of November 22, 1986, appellant attended the wedding reception of a co-worker. On his way to the reception, appellant met a friend and over the course of about one hour had a few beers, smoked a joint, took some valium and did a small amount of cocaine. Appellant arrived at the reception at approximately 8:30–9:00 p.m. and while there met Janis Kloshen, the mother of the bride and the victim in this case. Throughout the evening the two were seen drinking and dancing with each other and ultimately leaving the reception together at approximately 12:30–1:00 a.m. (November 23, 1986). They were last seen together at the Side Door Lounge in Millbury, Ohio, before eventually ending up at appellant's apartment in Oregon.

On the morning of November 24, 1986, at approximately 11:00 a.m., appellant walked into the Port Clinton Police Department and told Sergeant Thomas Blohm that he had killed a woman in Oregon. He was read his rights and in the presence of Sergeant Blohm, Detective Lockhart, Chief Bahnsen, and Assistant Prosecutor Dave Bolt, appellant gave a taped statement. In the statement appellant said that he had picked up a female by the name of Jan at

a wedding reception at the Millbury Fire Hall, that they had left the reception together and that after dropping off two of his friends, they had gone back to his apartment on Navarre Avenue in Oregon. Appellant said that he had left his apartment the following morning at 11:00 a.m., and that he had last seen Jan in his bedroom at that time. He told them that he had driven around trying to think of what to do and had eventually gone to the L & K Motel in Port Clinton to spend the night. Appellant stated that he had taken a pistol with him when he left the apartment but he had been too much of a coward to shoot himself, so instead he was turning himself in. Appellant told them further that if the police were to go to his apartment on Navarre Avenue, Jan would be there. After the taped statement was concluded, appellant told Sergeant Blohm, when asked what brought this all about, that the combination of alcohol and drugs possibly might have done it. Appellant said that he had been drinking and taking drugs, specifically marijuana and valium, and that the combination of marijuana and drugs makes him violent.

Based upon the information provided by appellant, the officers obtained a warrant to search appellant's apartment and called in Detectives Floyd Weaver and Michael Belcik to assist in the investigation. Upon entering the apartment, the first thing they observed was a shotgun and a fishing tackle box sitting on the kitchenette table. They proceeded down a small hallway to a bedroom door where Detective Weaver knocked and hollered but received no response. When they opened the door and went into the bedroom they found the body of Janis Kloshen lying on the bed. Upon examination, bruises, abrasions and lacerations were found on her face, chest, wrists, ankles, anus and neck. From the markings on her wrists and ankles it appeared that at some point she had been bound. Nylon cord was found tied to the bed frame and extending out from the right side of the bed. On the nightstand next to the bed were an ashtray, cigarettes, a can of beer, glasses containing alcohol and a belt. An autopsy of the victim revealed multiple external and internal injuries with the cause of death being strangulation.

On January 9, 1987, appellant was indicted by the Lucas County Grand Jury on two counts of aggravated murder in violation of R.C. 2903.01(B). The first count charged the appellant with the death of Janis Kloshen while committing or attempting to commit kidnapping, and the second count charged appellant with the death of Janis Kloshen while committing or attempting to commit rape. Appellant was also charged with two death penalty specifications as to each count. The first specification charged that the offense was committed while committing or attempting to commit kidnapping, and the second specification charged that the offense was committed while committing or attempting to commit rape. Appellant was appointed counsel on January 15, 1987, at which time he entered a plea of not guilty and the case was set for trial by

jury. Various pretrial motions were filed, including a motion to dismiss the indictment which was denied on May 11, 1987, and two motions for authorization to employ experts, an investigator and a psychologist, which were granted on May 1, 1987 and May 11, 1987, respectively. After waiving his right to a trial by jury, on September 2 and 3, 1987, appellant proceeded to trial before a three-judge panel. A verdict was rendered on September 3, 1987, in which the panel found appellant guilty of aggravated murder while in the commission of a kidnapping as charged in Count 1 of the indictment and Specification 1 attached to that count. The court further found appellant not guilty of Count 2 of the indictment and the remaining specifications. Appellant's case was continued to September 28, 1987, for appellant's mitigation hearing. At the request of appellant, pursuant to R.C. 2929.03(D), Dr. Gerald Briskin, a clinical psychologist, was appointed to conduct a psychological examination of appellant for purposes of use at the mitigation hearing. Dr. Briskin had previously been appointed by the court to assist the defense in trial preparation. Dr. Briskin saw appellant on two occasions prior to trial and then saw him again, for a third time, on September 19, 1987, after the trial but prior to the scheduled mitigation hearing.

On September 24, 1987, Dr. Briskin submitted a written report to defense counsel, a portion of which contained his opinion as to appellant's mental condition at the time of the offense. Based on Dr. Briskin's report, appellant filed various motions, including a motion to amend the plea of not guilty to include a plea of not guilty by reason of insanity and a motion for new trial. In lieu of the scheduled mitigation hearing, an evidentiary hearing on appellant's motion for new trial was begun on September 28, 1987, and concluded on October 22, 1987, at which time the court denied both appellant's motion to amend plea of not guilty to include a plea of not guilty by reason of insanity and appellant's motion for new trial and then proceeded with the mitigation hearing. At the close of the mitigation hearing, the court sentenced appellant to life imprisonment with parole eligibility only after serving twenty full years of imprisonment.

 This court will first consider appellant's eighth assignment of error in which appellant contends that the trial court erred in denying appellant's motion for new trial which was filed on September 28, 1987, after the guilt phase of the trial but prior to appellant's mitigation hearing.

Counsel for appellant argued to the trial court in support of the motion that Dr. Briskin's report, dated September 24, 1987, rendered an opinion sufficient to meet Ohio's legal standard for not guilty by reason of insanity and that he had only first become aware of these findings through the report and through conversation with Dr. Briskin after the verdict had been rendered. Appellant

contended that the obtaining of this information constituted surprise and newly discovered evidence pursuant to R.C. 2945.79(C) and (F)[1] and Crim.R. 33.[2]

At the hearing on the motion for new trial which began on September 28, 1987, appellant called Dr. Briskin to testify as to appellant's recollection of the night of the offense. Dr. Briskin testified that appellant told him the following: He had been out drinking with a friend and then went to a wedding reception where he met Janis Kloshen. They drank and danced together at the wedding and agreed to leave together. They stopped at a bar and then went to appellant's apartment where they drank more, talked about sex and viewed a pornographic video after which Janis disrobed and agreed to engage in sex while bound and handcuffed. Appellant recalled tying the victim, handcuffing her and getting into bed with her but his memory thereafter is fragmentary. Appellant thought that he had intercourse with her but was not sure. He woke up the next morning on the couch and then went into the bedroom where he found Janis dead on the bed. She was not tied or handcuffed. Appellant was upset, frightened and confused and, not knowing what to do, took the cords, the handcuffs and a pistol and went to a motel in Port Clinton. He contemplated suicide, but later decided not to kill himself. He then went to the police station and turned himself in. He could not account for her death and decided he really had not killed her.

As to his opinion of appellant's mental condition at the time of the offense, Dr. Briskin testified as follows:

"Q. Doctor, again based on your examination of Jim King, the testing, the history that you took, do you have an opinion to a reasonable degree of phychological [sic] certainty whether or not at the time of the commission of this offense, which was November the 23rd, 1986, whether or not Jim King had a mental illness or defect?

"A. Yes, I have an opinion.

"Q. And what is your opinion, Doctor?

---

1. R.C. 2945.79 reads, in pertinent part, as follows:
 "Causes for new trial.
 "A new trial, after a verdict of conviction, may be granted on the application of the defendant for any of the following causes affecting materially his substantial rights:
 "* * *
 "(C) Accident or surprise which ordinary prudence could not have guarded against;
 "* * *
 "(F) When new evidence is discovered material to the defendant, which he could not with reasonable diligence have discovered and produced at the trial. * * *"

2. Crim.R. 33(A)(3) and (6) correspond with the statutory provisions.

"A. My opinion is that he indeed did have a mental defect or disease at that moment.

"Q. And what would that be?

"A. That would be dissociative reaction.

"Q. And, Doctor, further do you have an opinion, to a reasonable degree of psychological certainty, whether or not at the time of the commission of this offense, November the 23rd, 1986, such mental illness or defect impaired Jim King's ability to reason?

"A. I do.

"Q. And what's that opinion, Doctor?

"A. That it did indeed impair his ability to reason, to understand what he was doing.

"Q. And, Doctor, further do you have an opinion, to a reasonable degree of psychological certainty, whether or not at the time of the commission of this offense, November 23, 1986, his reason was so impaired that he did not have the capacity to either know the wrongfulness of his conduct or the ability to conform his conduct to the requirements of the law?

"A. I do.

"Q. And what is your opinion?

"A. That he did not know the nature of his conduct nor could he conform.

"Q. And, Doctor, further do you have an opinion, based on a reasonable degree of psychological certainty, as to whether or not this defect or disease that you've just discussed with us of the mind was caused by the use of drugs or intoxicants?

"A. I don't think it's possible to separate out the degree to which this problem was caused by the Valium, the alcohol and the marijuana which he consumed that evening and how much was the product of the personality style that he had manifested throughout all of his adolescent and adult life.

"To be sure, the ingestion of large quantities of alcohol in combination with Valium and marijuana would certainly impair the internal controls of any individual and make impulsive behavior more likely, but dissociative—dissociation is not just impulsive behavior. It's a blanking off, a splitting off of the conscious personality from the impulses, and in order to do that I think that Mr. King needed to have the prodromal or basic personality structure that he had developed throughout the course of his life.

"So, the answer to the question is in part personality, in part substances to cause a dissociative reaction.

"Q. Doctor, after having gone through this process with Jim King, the testing, interviewing, getting a social history from outside sources, do you have an opinion, again based upon psychological certainty, as to Jim King's credibility?

"A. Yes.

"Q. And what is that opinion?

"A. It's my opinion that the narrative account he gave me of the events in question were substantially accurate, that the amnesia or the blackout elements of what took place that evening are genuine and that he is not malingering the story.

"MR. SPARROW: Nothing further, Doctor. Thank you."

At the conclusion of Dr. Briskin's testimony, the defense rested. The state offered no evidence at this time but rather, during argument, requested that the case be referred to the Court Diagnostic and Treatment Center for a separate evaluation as to appellant's mental state at the time of the offense. The court then recessed the motion hearing and referred the case to the Diagnostic and Treatment Center for further evaluation of appellant pursuant to R.C. 2945.39 and 2929.03(D)(1). Appellant was examined by Dr. Charlene Cassel, a forensic psychologist, and Dr. Thomas Sherman, a psychiatrist and medical director of the Court Diagnostic and Treatment Center. The hearing on appellant's motion for new trial reconvened on October 22, 1987, at which time the state offered the testimony of Drs. Cassel and Sherman. Both doctors testified as to appellant's mental condition at the time of the offense and both rendered opinions that appellant did not meet the criteria necessary to establish the insanity defense. At the close of Dr. Sherman's testimony, the state rested and counsel proceeded with arguments. In support of the motion, appellant's counsel argued that had they been aware that appellant was in a position to fit the parameters of legal insanity, they would have filed an amended plea of not guilty by reason of insanity in addition to a plea of not guilty, and they would have reconsidered appellant's decisions to waive a jury and not to testify. The gist of their arguments to the trial court in support of their motion for new trial appeared to be that had Dr. Briskin's report been available to them prior to trial, they would have proceeded with an entirely different trial strategy. After a brief recess, the court denied appellant's motion for new trial as follows:

"Based upon the testimony and the reports of Drs. Briskin, Cassel and Sherman, this court unanimously finds that the disclosure and finding of Dr. Gerald Briskin that the defendant was suffering from a transient mental disorder which rendered him incapable of knowing right from wrong or conforming his behavior to the right, first articulated in his report of Septem-

ber 24, 1987, constitutes (1) newly discovered evidence since trial and, (2) it could not, in the exercise of due diligence, have been discovered before the trial and, (3) that it is material to the issues and, (4) that it is not cumulative and that it does not impeach or contradict former evidence.

"Further, however, this panel unanimously finds that the evidence embodied in Dr. Briskin's report and testimony does not disclose a strong probability that it would change the court's verdict of September 3, 1987.

"Indeed, this panel unanimously finds that such testimony standing alone or weighed against the testimony of Drs. Cassel and Sherman discloses no possibility that the testimony, of [sic] offered, would have changed the result."

It is the appellant's contention that the trial court abused its discretion in finding that "Dr. Briskin's report and testimony, either standing alone or weighed against the testimony of Drs. Cassel and Sherman, discloses no possibility that the testimony, if offered, would have changed the result."

To warrant the granting of a motion for new trial in a criminal case based upon the ground of newly discovered evidence, it must be shown that the evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, at the syllabus; *State v. Lopa* (1917), 96 Ohio St. 410, 117 N.E. 319, approved and followed.

In applying this standard, the trial court clearly found that Dr. Briskin's testimony, as to the defendant's mental condition at the time of the offense, constituted material and newly discovered evidence which could not have been discovered with reasonable diligence prior to trial. However, the court found further that this testimony did not disclose a strong probability that it would have changed the verdict.

Obviously, the critical question under this assignment of error is whether or not the trial court correctly applied the above test to the particular facts of this case. In reviewing the cases which set forth this standard, it is clear that each involved newly discovered evidence which tended to either prove or disprove already existing issues.

In *Lopa, supra,* the appellant appealed from his conviction of second degree murder. The court of appeals reversed the conviction holding that a new trial should have been awarded by the trial court because of newly discovered evidence. The newly discovered evidence included the affidavits of two

witnesses tending to support the claim of the appellant and contradicting the testimony of a state witness. In *Lopa,* the court held that the new testimony proffered must neither be impeaching nor cumulative in character. The Supreme Court of Ohio found that the evidence offered by the defense in support of the motion for new trial was both impeaching and cumulative and reversed the judgment of the court of appeals and affirmed that of the trial court.

In *Petro, supra,* the appellant appealed to the Supreme Court of Ohio from the decision of the Court of Appeals for Cuyahoga County affirming the judgment of the trial court in overruling appellant's motion for new trial on the ground of newly discovered evidence. In support of his motion for new trial, appellant submitted the affidavit of a witness who stated that the coroner who examined the victim had informed the witness that the victim had been dead approximately sixty hours prior to his examination. The court, in affirming the judgment of the court of appeals, found that since the coroner testified at appellant's trial and had been thoroughly cross-examined as to the time which in his opinion the victim had been dead, the proffered testimony would merely tend to impeach that of the coroner. Relying on their decision in *Lopa,* the court found that the trial court committed no error in overruling appellant's motion.

In this case, however, the newly discovered evidence raises a question as to the existence of an entirely new issue, that is, the affirmative defense of not guilty by reason of insanity. This situation is necessarily distinguishable from those in which the court is required to weigh the evidence applicable to previously existing issues and determine whether or not there is a strong probability that the outcome would be different if the new evidence had been available before trial.

Appellant, by his motion for new trial, was seeking the opportunity to present an insanity defense and it was for that purpose that the testimony of Dr. Briskin was offered. It is clear from their arguments to the trial court that had defense counsel been aware of Dr. Briskin's findings prior to trial, their representation of appellant may have been under a totally different trial strategy and may have included additional evidence in support of the insanity defense such as the testimony of appellant himself.

At page 2 of its opinion furnished pursuant to R.C. 2929.03(F), following the mitigation hearing and sentencing, the trial court stated:

"Several days prior to the scheduled mitigation hearing, Dr. Briskin submitted a written report, a portion of which contained a provacative [*sic*] opinion of the defendant's mental condition the night of the offense. In fact, the opinion—rendered by a clinical psychologist with thirty-two years of

experience and a license to practice law—was couched in terms sufficient to meet Ohio's legal standard for insanity."

The court had determined, however, that, based on the additional reports and testimony of Drs. Cassel and Sherman, "appellant was psychologically affected at the time of the offense to some lesser degree than that contemplated by Ohio's insanity standard." The court had clearly weighed the testimony of Drs. Cassel and Sherman against that of Dr. Briskin and all of the other evidence and had determined that the defense of not guilty by reason of insanity would not succeed at a new trial.

While such application of the standard and weighing of evidence is certainly appropriate where the newly discovered evidence would tend to prove or disprove matters of fact as to existing issues, that is not necessarily the case where the newly discovered evidence supports, rather, the existence of entirely new issues not previously litigated.

■ The granting of a motion for a new trial on the ground of newly discovered evidence is within the sound discretion of the trial court and in the absence of a clear showing of abuse of that discretion, the ruling will not be disturbed on appeal. *State v. Williams* (1975), 43 Ohio St.2d 88, 72 O.O.2d 49, 330 N.E.2d 891, paragraph two of the syllabus. Under R.C. 2945.79 and Crim.R. 33, cause existed for the trial court, within its sound discretion, to grant a new trial if such cause materially affected appellant's substantial rights.

In this case, the trial court found that Dr. Briskin's report of September 24, 1987, constituted (1) newly discovered evidence since trial, (2) that it could not in the exercise of due diligence have been discovered before the trial, (3) that it was material to the issues, (4) that it was not cumulative and that it did not impeach or contradict former evidence, and (5) that it was set forth in terms sufficient to meet Ohio's legal standard for insanity. Having made these findings, the only remaining question was whether or not there was a strong probability that the result would be different if a new trial was granted.

Upon consideration of the entire record herein, this court finds that on the particular facts of this case as set forth above it was not reasonable for the trial court to assume that it could determine to what degree of probability a new trial, to a jury, with an entirely new trial strategy based on an insanity defense, would conclude with the same result. This court finds further that substantial rights of appellant were materially affected by the newly discovered evidence and the trial court abused its discretion in failing to grant a new trial.

Accordingly, appellant's eighth assignment of error is found well taken.

194

Upon consideration of Assignments of Error Nos. I through VII, this court finds that each goes to the weight of the evidence and in light of this court's ruling on appellant's eighth assignment of error, granting a new trial, these remaining assignments of error are rendered moot. Accordingly, Assignments of Error Nos. I through VII are found not well taken.

On consideration whereof, the court finds that the defendant was prejudiced and prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is reversed. This cause is remanded to said court for a new trial. It is ordered that appellee pay the court costs of this appeal.

*Judgment reversed*
*and cause remanded.*

CONNORS and GLASSER, JJ., concur.