Bryant, J., Dissents. For the following reasons, I respectfully concur in part in the opinion, dissent in part, and dissent from the judgment of the majority as outlined below.
The facts of this case are as follows. On Saturday, July 3, 1999, Saxton and Pamela Saxton ("Pam"), his wife argued over whether Pam would leave her car for Saxton to use while she went with her mother to a family reunion in Georgia. Pam decided not to leave the car with Saxton because he lacked a valid driver's license. So, she took it to her mother's home when she was ready to leave and left her car keys and her purse locked in her mother's bedroom. She told neither Saxton, nor Taranda Braddy, Pam's daughter who lived with her grandmother, that the purse and keys were at the house. Pam then left with her mother for the family reunion.
On Wednesday, July 7, 1999, the fire department was dispatched to a house fire. Taranda's body was found lying across the mattress in her bedroom. The forensic examination determined that she had died of asphyxia caused by strangulation before gasoline was poured across her body and around the room and a fire set.
On July 29, 1999, Saxton was indicted on one count of aggravated murder, one count of aggravated burglary, and one count of aggravated arson. The case was heard by a jury from February 22, 2000 to March 8, 2000. At the trial, the State posited its theory of the events on July 7, 1999. The State argued that Saxton wanted to use his wife's car, which was parked at Taranda's home. The State then claimed that Saxton stole a bicycle and rode it to Taranda's home where he confronted her about the location of the car keys. According to Pam's testimony, no one knew that the keys were locked in the grandmother's bedroom. The State argued that Saxton confronted Taranda, strangled her in his rage, and set fire to the house to cover up the murder. The State argued that Saxton then rode the stolen bicycle home and left it leaning against the bushes four doors from his home.
To prove this theory, the State presented the testimony of 57 witnesses. These witnesses tested as follows:
 * Kenny Rudolph, Joe Mawer, and Dodi Mawer testified that they saw smoke coming from the house at approximately 6:00 a.m. on July 7, 1999. None of them saw anyone in the vicinity of the house.
 * Officer Anthony Pahl was the first officer on the scene. He testified that he saw the smoke and saw Kenny Rudolph and Dodi Mawer attempting to wake anyone in the home. He also testified that he saw the bike track in the dew coming from the road and going through the back yard to the alley behind the home.
 * Firefighter Rex Coldwell testified that he went in the back door and had to unlock the front door to admit the fire hose. He also testified that he found a gas can at the top of the stairs and Taranda's body in the bedroom.
 * Lieutenant Terry Bowdre testified that he performed the fire investigation and determined that the fire was arson. He collected evidence to test for accelerants. He stated that the fire had more than one origin since the burn patterns did not meet, but were separated by unburned sections. He also testified that he observed the collecting of Saxton's clothes from the bathtub in Saxton's home.
 * Firefighter Kevin Smith testified that he saw the gas can at the scene, so started taking photographs for an arson investigation. He also testified that he saw the bicycle track in the dew and notified Officer Pahl.
 * Firefighter Wade Ralph was a fire investigator at the scene. He testified that he secured the scene to protect the evidence. He also testified that he observed Saxton in the crowd at the scene and that Saxton stated that the victim must be Taranda.
 * Deputy State Fire Marshal Lee Bethune testified that he examined the scene of the fire, but did not collect any of the evidence. He testified that he saw no sign of forced entry. He stated that there was more than one origin of the fire. According to his testimony, the suspect had to pour the gasoline on the body, at the top of the stairs and in the bathroom before lighting any of the fires or the suspect would have been trapped. Bethune was also partially responsible for collecting the clothes from the bathtub at Saxton's home. He testified that he found the clothes in the tub and noticed the strong smell of detergent. He removed the clothes from the water, placed them in bags, and gave them to the police officers at the scene. He also collected water from the tub.[35]
Bethune then took hand swabs from Saxton to see if any gasoline could be found.[36] He testified that only a minute amount of gasoline need be present in order to get a positive result.
 * Officer Electa Foster testified that she searched Saxton's home and found the clothes in the tub. She stated that she smelled the detergent in the water and smelled gasoline when she lifted the denim shorts from the water. She then removed the clothes from the tub and hung them over the side of the tub to dry. She testified that Saxton told her the clothes had been in the water since early Monday morning.
 * Robert Smiffen, Mark Springer, and Jerry Ryan all testified that a magazine ad, found imprinted on the bottom of Saxton's shoe was not available in the Marion area before July 6, 1999.
 * Tiny Braddy, Taranda's grandmother, testified that Taranda always locked the doors and that nothing was missing from the house. She also testified that Pamela had locked the purse and car keys in her bedroom and that Taranda did not know this. She also testified that the gas can found at the top of the stairs was one she kept on the front porch to fill the lawnmower. Finally, she testified that Taranda did not like Saxton and probably would not have let him in the house.
 * K-9 officer Matt Bayles testified that he brought his dog to the house to attempt to track the bike. However, the dog never picked up a scent, so was unable to proceed.
 * James Hardway, Bobby Crum and Christopher Crum all testified that they worked with Saxton at the Marion county fair on the night of July 4, 1999, tearing down rides. They testified that Saxton was wearing a yellow mesh outfit at the time. None of them got grease on them, though they did get dirty. Hardway testified that he next saw Saxton on the afternoon of July 5, 1999.
 * Sharon Crum testified that she does the laundry for Bobby and Christopher Crum and that their clothes were not greasy from tearing down rides at the fair.
 * Dr. Patrick Fardal, the medical examiner, testified that Taranda was strangled to death and the fire was then set to cover up the murder. Taranda was not alive at the time of the fire. He also testified that Taranda's body bore no signs of a struggle nor was there any evidence of sexual assault.
 * Jeff Carlyle testified that he saw Saxton on July 6, 1999, and he was wearing Adidas tennis shoes.
 * Lieutenant Wayne Creasap testified that he located a stolen bike leaning against the bushes in the alley that runs behind Saxton's home. There were no tracks in the area to indicate where the bike had come from or where its rider had gone. He also testified that he smelled gasoline in Saxton's bathroom.
 * Betty Macneil, Robert Blevins, and Charles Baker all testified that they saw the bike leaning against the bushes on July 7, 1999, and that it had not been there the previous evening. No one saw anyone around the bike and did not know how it had gotten there.
 * Danielle Jeffrey testified that she had placed the bike in her back yard on July 6, 1999, at approximately 11:00 p.m. She did not see anyone around. The next morning, she realized the bike was missing. She also testified that she had not ridden the bike much before it was stolen because the chain fell off every time it was ridden a few feet. This problem was not fixed before it was stolen.
 * Tracey Foos identified the bike as belonging to her daughter. She testified that the front tire was newer than the back tire and that they did not match.
 * Officer Howard Jones testified that he ordered the far end of the alley cordoned off because he saw bike tracks in the mud there. He requested that plaster casts be made of all tracks found in the alley, which he had isolated. Two tracks were evident in the casts. He also testified that the distance between Saxton's home and Taranda's home was 9/10 of a mile.
 * Detective Jim Oaklief testified that he collected evidence at the scene. He also photographed the tire tracks and made the plaster casts of the tracks. He testified that he used an ultraviolet light to locate accelerant at the scene and located it in the upstairs. However, no trace of accelerant was located on the steps or near either of the doors of the house. He then took fingerprints at the scene, but testified that none matched those of Saxton. Saxton then testified that he examined 125 bikes at the police station to see if any of them matched the tire tracks found in the alley behind the house. Although some were similar, none matched as well as the front tire of the bike found in the alley behind Saxton's home. He testified that the front tire of the bike was very similar to one of the tracks seen in the cast.[37] However, no track was found matching the rear tire of the bike. He further testified that the print on the bottom of Saxton's shoe matched an ad in the July 5, 1999, edition of Ohio Auto and RV magazine.[38] He also testified that entry to the Braddy house may have been forced because the back door was loose in the jam and Mrs. Braddy stated that it was tight before she left. He also found a butcher knife in Taranda's room. He found two condom wrappers at the scene and one used condom wrapped in toilet paper with blood on it. The DNA on the outside of the condom did not match that of Saxton and was believed to belong to Jeremiah Trumble from a sexual encounter that occurred on July 4, 1999. Oaklief testified that Trumble refused to give a DNA sample. He also testified that no attempt was made to obtain the local phone records for Taranda's phone until February 2000 (the month of trial). At that time, the attempt was unsuccessful because more than 90 days had elapsed since the day of the murder. The phone company does not maintain records of local calls after 90 days.
 * Shirley Harrison, a Sprint employee, and Todd Haywood, an AT T employee, both testified that calls were made to 419-522-3979 from a pay phone in Marion. The phone number belonged to Tanya Stone, a former girlfriend of Saxton's, and the pay phone is near Saxton's home. The calls were made at 9:28 p.m. on July 6, 1999, and at 2:51 a.m. on July 7, 1999.
 * Stephanie Pittman testified that she saw Saxton wearing the yellow mesh top on July 6, 1999. On July 7, 1999, she was at Saxton's home and found the clothes in the tub. Later that day, she received a phone call from Saxton asking her to go look for a bike in the alley.[39]
She also testified that Saxton told her he was outside at approximately 3:45 a.m. on July 7, 1999. She further testified that police and the district attorney had pressured her to testify and had told her that they had Saxton's fingerprints and semen at the scene of the crime.
 * Officer Steve Ross testified that he overheard Ms. Pittman on the phone asking about the bike. Testified that there were two bikes in Saxton's back yard, but they did not look as if they had been used in a while. He was present when the shorts were found and smelled gasoline on them. He saw the auto magazine in the living room of Saxton's home. He also testified that he saw no marks on Saxton's body on July 7, 1999.
 * Hershal Slone testified that he saw a bike in the alley at approximately 6:30 a.m. on July 7, 1999. However, he testified that the bike he saw was not the same one identified as an exhibit because the bike he saw was newer and had gears. The bike identified as the stolen bicycle had no gears. He never saw Saxton anywhere in the alley.
 * G. Michele Yezzo, a forensic scientist, testified that she examined a blue fiber found on the seat of the bike and determined that it was probably from denim material. However, she could not limit the source anymore than that. She also testified that she tested the soil samples removed from the bike with the various samples from the crime scene and the alley behind the house. The samples did not match. She then examined the tracks shown in the tire casts and determined that the various tracks were made by different bikes. Finally she testified that ink from the magazine in question transferred to another surface most readily when it came into contact with gasoline.[40]
 * Christa Rajendram, a forensic scientist, testified that gasoline was found on either the shorts or the shoes. She was not able to be more specific because the items had been placed in the same bag, thus causing cross contamination. All the other items found in the tub tested negative for gasoline. She testified that the test is capable of picking up an amount as miniscule as 1/10 of a drop of gasoline. She also testified that gasoline was the accelerant used at the scene. However she was not able to determine the specific brands of gasoline. She finally testified that the magazine tested negative for gasoline.[41]
 * Margaret Saupe testified that she tested the shorts in which Saxton claims to have defecated. The shorts tested negative for fecal matter, though she did find stains of some sort. She also testified that the swabs of Taranda tested negative for semen.
 * Pam, Saxton's wife and Taranda's mother, testified that Saxton was angry about not having the car to use and that on July 3, 1999, he threatened to blow up the car and burn down the house.[42] She also testified that she found the auto magazine in the house she shares with Saxton later that week. She had never known Saxton to wash anything but underwear in the bathtub. However, there is no washing machine in the house, only a dryer. She further testified that Saxton originally told her he let his mother in the house around 4:00 a.m. and later said that he let her in the house at 6:00 a.m. She testified that Taranda always kept the doors locked and would not have admitted Saxton at that time of the night.
 * Kimberly Keith testified that she spoke with Saxton two days after the murder. Saxton told her that he had been in Cleveland with his mother. He later changed his story and said his mother slept in the U-Haul that night, but did not say why. She stated that Saxton seemed upset that Pamela did not leave him the car, but he was not angry.
 * Detective Scott Sterling overheard Ms. Keith's conversation with Saxton. He testified that Saxton told Ms. Keith that another inmate, in jail for violating a civil protection order, had heard that Taranda was strangled and then burned. He testified that at that time, he did not know the cause of death, so he was surprised that Saxton did. He also testified that he called those numbers that were listed on the caller ID unit at Taranda's home, but did not attempt to locate those listed as "private" or "unavailable." He did not check Taranda's answering machine. He testified that Taranda's pager was never found.
 * Detective Jeff Shenefield testified that he interviewed Saxton. At Saxton's home, he found the clothes in the bathroom and smelled detergent and gasoline on the shorts. He also found two bikes in Saxton's back yard, but they both had flat tires. During the July 7, 1999, interview, Saxton told him that he went to bed between 2:00 a.m. and 2:30 a.m. and woke up when his mother arrived around 3:00 a.m.[43] Later, he informed Saxton that a stolen bike was found in the alley behind his house approximately four doors down. During the July 12, 1999, interview, Saxton told him that the shorts were soaking because he had accidentally defecated in the shorts. On July 13, 1999, Saxton told him that he had used some gasoline from his neighbor to clean off his hands and may have splashed some on himself.[44] He also testified that he did not check the DNA on the condoms because Trumble admitted to putting one in the trash can on Sunday. He testified that Saxton was very cooperative and did not have any marks on his body on July 7, 1999, that would indicate any type of struggle. Finally, he testified that no investigation was done to determine who, if anyone, had phoned Taranda's pager that evening.
 * Anthony Tambasco, a forensic scientist, testified that he attempted to analyze a potential blood sample found on a shirt found near Taranda's body[45], but was unable to do so. He explained that the blood probably came from the body during the fire, not prior to death. He also stated that they did not perform DNA tests on the condom or the blood on tissue it was wrapped in because it was too expensive.
 * Joseph Johnston testified that at approximately 6:00 a.m. he saw an adult black male riding down Silver Street on a 20" bike. However, he did not identify either Saxton or the bike as the one he saw. He described the rider as wearing long pants, a dark shirt, and a stocking cap.[46]
 * Robert Starcher testified that he lives in a house on the alley behind Taranda's home. At 4:15 a.m. on July 7, 1999, he was awakened by his dog barking. He looked out the window, but did not see anyone. He also testified that he left the house for work at 5:45 and did not see anyone in the vicinity.
 * Thurnetta Hood testified that she spoke with Taranda the night of the murder and that she had no intention of going out. She also testified that she went to Lucius Jones' apartment on July 7, 1999, to tell him about the fire, but no one answered the door. When she was at Saxton's home, she noticed that the house was a mess and that there were clothes soaking in the tub. She did not smell gasoline in the bathroom.
 * Jeremiah Trumble testified that he spoke with Taranda on July 7, 1999, at approximately 1:15 a.m. and she wanted him to come over. He declined. He also testified that he had sexual relations with Taranda on July 4, 1999, and had placed the used condom in the garbage. He did not wrap it in a tissue.
 * Sheryl Mahan, the fingerprint expert, testified that Saxton's prints were not found at either the scene or on the bike. The only identifiable prints found were on the back door and belonged to Kenny Russell and Dodi Mawer.
 * Officer Mark Young testified that he collected the clothes from the bathtub in Saxton's home. He did smell gasoline in the bathroom. He also stated that he attempted to follow the bike tracks, but could not do so because they would go over stones that did not permit a track to be made.
 * Benjamin Fallor, a meteorologist, testified that between 7:00 a.m. on July 6, 1999, and 7:00 a.m. on July 7, 1999, the high temperature was 91 degrees and the low temperature was 58 degrees. The area received .2 inches of rain during that time period.
 * Gary Squires and Kathy Caudill testified that the chain of custody the various exhibits had not been broken.
 * Lucius Jones II testified that Taranda had come to his apartment on July 7, 1999 at approximately 12:30 a.m. They engaged in sexual relations and she left sometime between 1:30 and 2:30 a.m. He testified that he refused to give a DNA sample on the advice of his attorney and that he felt the police were harassing him. His phone records show that he called Taranda's pager at 1:03 a.m.
 * Plez Booker testified that he saw Jones standing in the parking lot of Jones' apartment complex the morning of July 7, 1999, but he did not see Taranda.
 * Officer Rob Reed testified that he gave Saxton's mother directions to Saxton's house at around 3:00 a.m. on July 7, 1999.
 * Officer Jerry Zacharias testified that the number of the pay phone used by Saxton matches the number of the phone from which calls were made to Tanya Stone on July 7, 1999.
 * Officer John Gruber testified that he took Dodi Mawer's fingerprints as a control for the prints found on the back door.
 * Officer Randall Caryer testified that Saxton asked him about the extent of the fire damage at the house. He also testified that it is not unusual for the fingerprints of the suspect to be lacking from a crime scene.
For its case, Saxton presented three witnesses who testified as follows.
 * Lonnie Yates testified that he saw Saxton the evening of July 3, 1999, and Saxton did not seem upset about not having the car.
 * Walter Eugene Thieshen testified that he met Saxton in jail on July 7, 1999. He testified that he was in jail for violation of a civil protection order and that he had told Saxton that he heard Taranda had been strangled and that the fire had been set. He also testified that he was told the police were looking for a small built Mexican on a bike. He testified that he overheard this information while in the police car. He also testified that Detective Shenefield picked him up and asked him "what the word on the street" about the murder was.[47]
 * Larry Dehus, a forensic scientist testified that the evidence was gathered inappropriately as it should all have been bagged separately, not placed in one bag. He agreed with the State's witness that the fiber most likely came from denim and that no further identification was possible. He stated that if Saxton had stepped on the magazine with gasoline on his shoes, the magazine should have had traces of gasoline on it. He then testified that the items with gasoline on them would have had to have had minute amounts of it on them for gasoline not to be found floating on top of the water in the bathtub. He tested the shorts and found the presence of fecal material. He also tested bicycle tracking and testified that the rear tire should have at least partially eradicated the impression left by the front tire unless the rider was constantly turning. He then testified that in his experiments, the ink from the magazine transferred to the bottom of a tennis shoe when the bottom of the shoe was dry, was moistened with water, and was moistened with gasoline.
On March 8, 2000, the jury returned with a verdict of guilty on all counts. On March 21, 2000, Saxton filed a motion for acquittal and a motion for a new trial. A hearing was held on these motions on May 15, 2000, and May 19, 2000. On July 6, 2000, the trial court denied both motions. On September 22, 2000, Saxton was sentenced to life imprisonment with parole eligibility after 20 years for the aggravated murder, to ten years imprisonment for the aggravated burglary, and to eight years of imprisonment for the aggravated arson. The trial court ordered that the sentences be served consecutively.
The third and fourth assignments of error raised by Saxton deal with the admissibility of evidence. The admission of evidence is left to the discretion of the trial court and will be reviewed on an abuse of discretion basis. State v. Awkal (1996), 76 Ohio St.3d 324,667 N.E.2d 960. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. Franklin Cty. Sheriff'sDept. v. State Emp. Relations Bd. (1992), 63 Ohio St.3d 498, 589 N.E.2d 24.
In the third assignment of error, Saxton argues that the trial court should not have permitted Michelle Yezzo ("Yezzo") to testify concerning her paper-to-paper transfer experiments.
A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons:
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles:
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
Evid.R. 702.
 The expert may testify in terms of opinion or inference and give his reasons therefore after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise.
Evid.R. 705.
In this case, the only part of Yezzo's testimony subject to objection was that paper to paper transfer experiment. Saxton claims that since the original transfer was newsprint to the sole of a tennis shoe, the experiment is too different to be reliable. However, Yezzo testified that what she was testing was the solubility of the ink, not the ability of the surface to pick up the transfer. She testified that she used the paper dry, moistened with water, and moistened with gasoline in order to determine which caused the ink to transfer best. Her tests revealed that gasoline was the best solvent of the ink.[48] Based upon this, the State argued that Saxton had gasoline on the bottom of his shoes that permitted the newsprint to transfer to the sole of the shoe. The trial court determined that the differences in the circumstances went to the weight of her testimony, not the admissibility. Although the test was not identical to the original transfer, it was conducted in a way, which would yield accurate results on the solubility of the ink. The differences between the experiments and the original circumstances were explained to the jury, thus giving the jurors enough information to decide the amount of weight to give the results. Since the testimony of Yezzo complied with the requirements of the rules of evidence, the trial court did not err by permitting the testimony and I concur with the majority's decision to overrule this assignment of error.
The fourth assignment of error raises the question of whether the trial court should have permitted Pam Saxton to testify concerning Saxton's threat to burn down the house. The basis of this argument is that Pam Saxton had never mentioned this threat until trial. Saxton claims that this failure is a prejudicial surprise and has no credibility. However, the question of the credibility of a witness is one for the jury to decide. On cross-examination Saxton's attorney questioned Pam Saxton about her failure to mention this threat previously. Thus, the jury knew that her testimony was inconsistent with her prior statements. The jury was free to believe or disbelieve that the threat was made. The trial court, however, did not err by permitting her inconsistent testimony to be admitted. Thus, I concur with the majority that the fourth assignment of error should be overruled.
Saxton argues in the second assignment of error that the evidence is not sufficient to support the conviction. When reviewing a criminal conviction, the court's examination of the record is limited to determining if evidence was presented, which, if believed, could satisfy the average person of the defendant's guilt beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. "In conducting this evaluation, we must view the evidence in the light most favorable to the prosecution, and ask whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at 274, 574 N.E.2d at 504.
At the trial, as discussed above, the State presented its theory of the crime. This theory is supported by the fact that gasoline was the accelerant used at the crime scene to set the fire. There is testimony that gasoline was found on either Saxton's shoes or his shorts.[49]
The State argued that Saxton got the gasoline on the bottom of his shoes by walking through the gasoline at the scene as he was lighting the various puddles of gasoline. The State also argued that having gasoline on the bottom of the shoes is what made the magazine ink transfer to the sole of Saxton's tennis shoe. At Saxton's home, the police found several items of clothing and the tennis shoes soaking in a tub with Purex and Tide. Saxton claimed that the items had been there for three days, but a print from a magazine on the bottom of one of the tennis shoes indicated that the shoes had only been there for less than 24 hours. Additionally, Saxton could not account for his whereabouts on the night of the murder and gave conflicting statements throughout the investigation.
Bicycle tracks were found in the dew of the yard leading from the road through the yard to the alley behind Taranda's home. In the alley, the police found tracks in the dirt that were very similar to those on the front tire of the stolen bicycle found four doors away from Saxton's home. The bicycle seat contained a cotton fiber from denim. There is also the threat that Saxton allegedly made to Pam about burning down the house. The police also questioned other friends of Taranda, but were unable to determine a more likely suspect. Giving every benefit of every doubt to the State, a reasonable person might conclude that Saxton committed the offense and the second assignment of error should be overruled.
In the first assignment of error, Saxton claims that the conviction is against the manifest weight of the evidence.
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546. To establish a charge of aggravated murder, the State must prove beyond a reasonable doubt each of the following elements of the offense. The 1) suspect 2) purposely 3) caused another's death 4) while committing or attempting to commit 5) kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, or escape. R.C. 2903.01. To establish a case of aggravated arson, the State must prove that 1) the suspect 2) knowingly 3) caused physical harm to an occupied structure 4) by means of fire. R.C. 2909.02. The elements of aggravated burglary are that 1) the suspect 2) trespassed in an occupied structure 3) by force, stealth, or deception 4) when another person was present 5) with the purpose to commit any criminal offense and 6) the offender inflicts physical harm on another. R.C. 2929.11.
In this case, the State presented evidence through the testimony of 57 witnesses.[50] Through that testimony, the State established that Taranda was killed and the fire was set at sometime after 2:30 a.m. and before 6:00 a.m. when the fire department was called. The State also proved that Taranda had been strangled and that gasoline had been poured over the body and throughout the upper level of the house and a fire was set. At some point after the dew settled on the ground, a bicycle was ridden through the yard of Taranda and back into the alley. A bicycle with a similar tire tread to one of the marks found in an alley behind Taranda's home was found in an alley four doors away from Saxton's home.
At Saxton's home, the police located several items of clothing soaking in the bathtub. Saxton claimed that they had been there since Monday, however, the testimony of other witnesses indicates that the shoes and some of the items of clothing were worn on Tuesday. The State then produced evidence that Saxton had gasoline on the bottom of his shoes and/or on his shorts. At the time of the initial questioning, Saxton did not account for how the gasoline came to be there. The State also showed that Saxton had left his home to make phone calls to a girlfriend until approximately 3:00 a.m. Saxton did not meet his mother until later. At no time has Saxton provided a credible explanation for his whereabouts.
The State's theory of the crime is that Saxton was angry because his wife did not leave him the car. Acting on this, Saxton allegedly went to Taranda's house to get the keys and the car. The State claims that Saxton stole the bike and rode it to the house. When Taranda let him in the house, there was a confrontation about the keys and Saxton allegedly strangled Taranda in anger. To cover up his crime, the State claims that Saxton took the gasoline can off of the front porch and set fire to the house. In the process, Saxton allegedly got gasoline on his shoes as he walked through the puddles of gasoline to set fire to a previously poured puddle of gasoline.[51] The State claims that Saxton then rode the bike through the yard to the alley, down the alley to Silver Street and home, abandoning the bike four houses away from his own. Then, to get rid of any evidence, Saxton placed the clothes in the tub with a whole bottle of detergent.
From the testimony presented, it is clear that there are many inconsistencies in the presentation and there are several questions raised by the testimony. One question that is raised is what connection there is between the stolen bike and Saxton. The only witness to seeing a black man on a bike at about 6:00 a.m. on July 7, 1999, did not identify either the defendant or the bike and described a different outfit than that believed to be worn by Saxton. The State presumes that Saxton stole the bike based upon the fact that it was found in the alley behind his house. Another question is why the bike track starts at the road in front of Taranda's home and goes through the back yard. Since Saxton lives to the east of Taranda's house, why did he come to the house from the street to the west of the house, but leave through the alley? Also, why would Saxton steal the bicycle in the first place since he lived less than one mile from Taranda and was allegedly going to the house to get a car? Why would he go out of his way to steal a bike so that he could go get a car? Another question that is raised is if there was enough gasoline on his shoes to allow an ink transfer when Saxton got to his home, why was there no trace of accelerant on the stairs in Taranda's home or inside the doorway of Taranda's home where the arsonist would have had to walk to leave the house? Why did the police not test the pedals of the bike for accelerant? Why did the police not test the carpet in Saxton's house for the presence of gasoline? If there was sufficient gasoline to cause the transfer of the ink when Saxton allegedly stepped on the magazine, why wouldn't the surfaces with which Saxton had prior contact also have traces of gasoline? How did the bike manage to go through the mud in the alley and leave a track without picking up any of that mud? Finally, all the testimony on the subject shows that Saxton was not told the keys were at the house. There was no testimony that Pamela told anyone she had left the keys in Ohio rather than taking them and her purse with her.[52] Given all of the inconsistencies and the failure to connect Saxton to the scene with anything more than speculation, I do not believe a reasonable person could conclude beyond a reasonable doubt that Saxton committed these offenses. Thus, I would affirm the first assignment of error.
Saxton claims in the fifth assignment of error that prosecutorial misconduct prevented him from having a fair trial. In support of this argument, he claims that the prosecutor misstated the evidence in his closing argument and commented on the Saxton's failure to produce any witnesses contradicting the State's theory of the crime. No objections were made to either of these instances of alleged misconduct. Prosecutorial misconduct is not grounds for reversal unless it so taints the proceedings that it deprives the defendant of a fair trial. Statev. Phillips (1995), 74 Ohio St.3d 72, 656 N.E.2d 643. The statements alleged as misconduct, as well as some other statements may have been interpreted as misstating the evidence, however, they alone did not deny Saxton a fair trial. The jury was informed by defense counsel that the beeper had never been found. The jury was also informed that the first time Pam mentioned the threat to burn down the house was at trial and that none of her prior statements mentioned the threat.
Saxton also argues that it was misconduct for the prosecutor to comment on Saxton's failure to produce any evidence to contradict the State's theory. However, it is not error for the State to comment on the fact that the defendant has neither presented witnesses in his/her defense or that he or she did not rebut the State's case. State v. Clemons (1998),82 Ohio St.3d 438, 696 N.E.2d 1009. Here, the State pointed out that Saxton did not present any witnesses that provided him with an alibi. This is not impermissible. Thus, I concur in the decision to overrule the fifth assignment of error.
In the sixth assignment of error, Saxton alleges that his counsel was ineffective.[53]
 When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.
 On the issue of counsel's ineffectiveness, the appellant has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. * * * [T]he initial burden [is placed] upon the appellant since, * * * [t]o impose automatically the initial burden of proof on the state * * * would penalize the prosecution for acts over which it can have no control.
State v. Jackson (1980), 64 Ohio St.2d 107, 110-11, 413 N.E.2d 819, 822.
Here, Saxton claims that his counsel were ineffective because they did not procure the witness upon which his motion for a new trial was premised. Allegedly, this witness would have provided an alibi for Saxton. However, the first time trial counsel heard of this witness was less than a month before trial. A subpoena was issued, but service was not completed prior to trial and the witness did not appear.[54] Since this is the only allegation of incompetence, and trial counsel did attempt to compel the witness to appear, one cannot conclude that trial counsel did not act competently. I concur in the decision to overrule the sixth assignment of error is overruled.
The eighth assignment of error challenges the trial court's judgment denying Saxton's motion for a new trial. I note with considerable interest that the trial court in that judgment observed as follows:
 There was no direct evidence in this case which could place the defendant at the scene of the crime. There was no direct evidence that the defendant personally committed any act necessary to the offenses of burglary, murder or arson. Only circumstantial evidence was offered by the state as to any issue. While there were 57 witnesses presented by the state, much of the testimony was mere foundation, with no direct materiality to the issue of guilt. Examples are the three witnesses who first observed the fire and called 911, and numerous fire personnel and police who described the scene of the crimes.
 This case was tried on the quantity of the evidence, not the quality. Much of the physical evidence was mishandled, and the testimony of several witnesses who handled that evidence was contradictory as to who did what and how.
Judgment on Motion for Acquittal, 1-2. The trial court however, not wishing to overturn the jury's verdict, denied the motion for acquittal.
Upon review of the record, I concur with the trial court's evaluation of the evidence. There was no direct evidence of Saxton's involvement in the crimes. The whole case was based upon a theory developed by the State about how the crimes might have occurred, supported by slim evidence, such as gasoline on the bottom of Saxton's shoes and a stolen bike found in an alley near Saxton's home. Additionally, it is clear from the record that several tests that could have either strengthened the State's case or weakened it were not performed.[55] Thus, I would affirm the eighth assignment of error.
The final assignment of error argues that the trial court should have granted the motion for a new trial. A new trial may be granted on the basis that there was misconduct by the prosecuting attorney or on the grounds that new evidence material to the defense is discovered, which the defendant could not reasonably have discovered and produced at trial. Crim.R. 33(A). A motion for new trial is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent an abuse of discretion. State v. Schiebel (1990),55 Ohio St.3d 71, 564 N.E.2d 54. Here, Saxton claims that his alibi witness had been located only after trial and supplied an affidavit that attested that she was with him at the time the crimes were committed. However, at the hearing on the motion for a new trial, the witness refused to testify and asserted her fifth amendment right to remain silent.
To warrant the granting of a motion for new trial in a criminal case based upon the ground of newly discovered evidence, the movant must show that the evidence 1) has a strong probability that it will change the result if a new trial is granted, 2) has been discovered since the trial, 3) is such as could not in the exercise of due diligence have been discovered before the trial, 4) is material to the issues, 5) is not merely cumulative to former evidence, and 6) does not merely impeach or contradict the former evidence. State v. King (1989), 63 Ohio App.3d 183,578 N.E.2d 501. The trial court, in evaluating the motion held the following:
 The motion was supported by the affidavit of a Donna Bonds, dated March 29, 2000. Ms. Bonds' affidavit unequivocally stated that she had been with the defendant on the date of the subject murder, and spent the night with him. She further stated that prior to the trial date she had been confronted by "two police officers" in Mansfield, Ohio, where she lives, and was told the date on which the defendant's trial was to begin and that if she "testified for Anthony they would make sure that [Donna Bonds] would go to prison." Further, she stated that as a result, she "was scared and [she] avoided any contact with Anthony's attorney and [she] did not want to receive the subpoena that they were trying to serve * * *."
 This "supplemental" motion and attached affidavits were filed on March 31, 2000. On April 10, the court received the state's response, accompanied by the affidavit of Lt. Shenefield of the Marion Police Department, who stated that he had talked to Donna Bonds on April 4, 2000, and that she told him she had lied in the affidavit that she signed March 29.
 On April 18, 2000, the defense replied with another affidavit from Ms. Bonds, dated April 5, 2000, stating that the information in her first affidavit was true. She further stated that on April 4, 2000, she was confronted by two Marion police officers (identifying one as Lt. Shenefield), accompanied by Mansfield police. She stated she was questioned and threatened for having given her first affidavit, and that as a result she signed a statement prepared by the officers, but reconfirmed that her first affidavit was true.
 The court then scheduled a hearing on the motions for acquittal and for a new trial and Ms. Bonds appeared at the hearing. During discussion with counsel, the prosecutor indicated that he had talked with Ms. Bonds that morning, alone, in the law library. The court expressed concern that, after two affidavits alleging intimidation by law enforcement, Mr. Slagle would further complicate the issue by such a confrontation. The court's concern was heightened by the fact that the Marion County Law Library consists of two small and dreary rooms, more likely to engender fear than confidence.
 The hearing was commenced, and defense chose to proceed on their motion without calling Ms. Bonds, relying on her affidavits. However, the state chose to call Ms. Bonds. The witness proved to be an eighteen-year-old black girl, small in stature, and obviously quite nervous. Ms. Bonds was advised that she might be entitled to a privilege against testifying, due to apparently contradictory statements in an official proceeding, and that the court would appoint an attorney to counsel her if she so desired. She did request an attorney and one was immediately contacted to talk with her. Those discussions became extended and the hearing was continued to another date.
 Ms. Bonds was called to the stand by the state at the second hearing, with appointed counsel present near her. Her testimony was extremely limited, because she claimed a Fifth Amendment privilege.
 Ms. Bonds' mother also testified at the request of the state. She stated that she was present during some of the discussions with Lt. Shenefield and other officers on April 4, but was asked to leave the room during some portions of the interview. It was apparent that prior to April 4, the mother had no idea that her daughter might be an alibi witness in a murder case.
 Mother also testified that her daughter was nervous by nature and easily excited, that Donna would be intimidated by police officers, as was she (the mother), and that when Mr. Slagle took Donna into the law library, he had asked to talk to her alone. It must be noted that of the three police officers that testified about the April 4 meeting with Donna Bonds, all were white
 Mr. Slagle also testified for the state, stating that he had not heard of the name of Donna Bonds prior to March 31, 2000 filing of the defense. When reminded by defense counsel that Ms. Bonds was named in a praecipe for subpoena filed on February 17, 2000, Mr. Slagle responded with the speculation that his secretary had regularly checked the Clerk's file, and while she had found every other praecipe, she had apparently missed that one. He also stated that upon receipt of the defense motion containing Donna bonds' affidavit, he had called Lt. Shenefield, and instructed him to go to Mansfield and interview Ms. Bonds. He stated that he saw nothing improper or intimidating in that conduct. He further saw nothing intimidating in his action of taking Donna away from her mother and into the law library on the morning of the first hearing on these motions.
 The court finds that the information provided in Donna Bonds affidavit "discloses a strong probability that it will change the result if a new trial is granted," thereby meeting the first requirement under Petro, if the witness would testify.
Judgment on Motion for New Trial, 2-5. The trial court went on to find that the evidence met all of the prongs of the test except that it was not discovered since trial and that defense counsel did not exercise due diligence by requesting a continuance of the trial. Based on these failures, the trial court denied the motion for a new trial based upon the discovery of new evidence.
Another basis for the motion for a new trial was that the prosecutor engaged in misconduct. Saxton claims that the witness was not listed on earlier requests for subpoenas because of the pattern of intimidation and/or harassment by the State and its agents. The trial court denied this basis because no evidence of harassment against any other witness was submitted at the hearing on the motion to show a pattern.
When reviewing the ruling on the motion for a new trial, I am once again struck by the trial court's findings that support the motion and then the subsequent denial of the motion. I am also concerned about the allegations of misconduct by the State's agents, which have not been addressed by the State. The State's argument against the motion is that there is no new evidence because the "new witness" is asserting herfifth amendment right due to inconsistent statements.[56] However, the State does not address the allegations that Ms. Bonds was threatened with prison if she testified on behalf of Saxton and that she was told to avoid Saxton's attorneys and the subpoena. The State also does not address the second affidavit which states that Ms. Bonds was intimidated into signing the statement she gave to the police and that her original affidavit was true. These allegations, along with various other allegations of intimidation and harassment by the police department made by various witnesses during the trial are disturbing.[57]
Also disturbing is the statements made by the prosecutor during closing arguments. The trial court stated as follows:
 While Ohio courts have allowed prosecutor's [sic] to comment on the defendant's failure to call witnesses, there is the ever-present danger that such comments might prejudice the defendant by causing the jury to believe that the defendant had an obligation to present some evidence of his innocence. Such arguments should be avoided. Furthermore, this court should have given a limiting instruction when the defense objected during argument.
Judgment on Motion for New Trial, 7. Closing arguments also contained instances of misstated evidence by the State as noted earlier.
The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. State v. Apanovitch (1987),33 Ohio St.3d 19, 514 N.E.2d 394. In this case, some of the alleged misconduct was allegedly perpetrated by the investigative officers.[58]
However, this alleged misconduct may have interfered with Saxton's ability to present a defense at his trial. All reasonable doubts must be given to the defendant and any misconduct on behalf of the prosecution should be imputed to the State. See State v. Defronzo (1978),59 Ohio Misc. 113, 394 N.E.2d 1027 (holding that the police represent the state no less than the prosecutor's office and the taint on a trial is not less if the police, rather than the state's attorney is guilty of misconduct) and State v. White-Barnes (July 22, 1999), App. No. 98CA2459, WL 566856, unreported. The trial court determined that the testimony of Ms. Bonds, if she testified consistent with her affidavits, probably would have affected the outcome of the trial. Additionally, the trial court has repeatedly expressed concerns about how the trial was conducted and the relevancy of the evidence, implying doubt about the fairness of the trial. A review of the totality of the circumstances likewise engenders doubt that Saxton received a fair trial, thus tainting any confidence in the correctness of the jury's verdict. The trial court's denial of the motion for a new trial therefore is unreasonable and the ninth assignment of error should be sustained.
As a result of the above analysis, I would reverse the trial court and remand for a new trial. Thus, I respectufully dissent from the judgment of the majority.
[35] The lab results from these items all came up negative for gasoline, except for the shoes and or shorts. The water sample collected also tested negative for gasoline.
[36] The hand swabs tested negative for the presence of gasoline, however this may be explained by the passage of time between the fire and the test.
[37] The other track was not matched to any bike.
[38] A copy of this magazine was found at Saxton's home.
[39] The State argues that the only way that Saxton could have known where to look for the bike is if he put it there. However, the call was made at around 4:00 p.m. on July 7, 1999. At approximately 2:30 p.m. the transcript from the police interview with Saxton indicates that Detective Shenefield told Saxton that they had found a stolen bike in the alley four doors down from his home. Since Saxton lives on the corner, there was only one direction to look.
[40] This opinion was based upon her tests transferring ink to paper. She first applied pressure to dry paper, then to paper moistened with water and finally to paper moistened with gasoline. The gasoline treated paper was the only one that accepted the transfer.
[41] She testified that she did not test the specific page because that might have prevented the performance of other tests.
[42] The first time that the threat to burn down the house was mentioned was during the trial testimony. This threat was never mentioned in any of the previous statements. Only the threat to blow up the car was previously disclosed.
[43] The phone calls show that Saxton was on the phone with Ms. Stone at 2:51 a.m.
[44] Further investigation revealed that the neighbor did have several cans of gasoline at his home.
[45] The shirt was presumed to have belonged to the victim as it was found lying on the bed.
[46] Saxton was believed to have been wearing denim shorts and a light colored shirt. This assumption was based upon the fact that these clothes, along with others, were found soaking in the tub and the shorts were said to smell of gasoline.
[47] Detective Shenefield admits picking up Thieshen and asking him about the word on the street. However, he denies that Thieshen heard about the cause of death from him or any other officer. Claims that Thieshen told them that Saxton had known the cause of death. Thieshen denies that Saxton ever told him the cause of death, but states that he gave the information to Saxton.
[48] According to Yezzo, the surface upon which the ink is to be transferred is inconsequential to the solubility of the ink. So she did not run a test attempting to transfer the ink to rubber.
[49] The laboratory could not determine whether the gasoline was on a shoe or on the shorts because they were placed into the same plastic bag, thus contaminating the items.
[50] Although numerous witnesses were presented, most of the testimony presented was cumulative in effect. None of it supplied direct evidence that Saxton was present at the scene of the crime.
[51] This conclusion can be drawn from Yezzo's testimony that the ink from the magazine transferred most easily when it came in contact with gasoline.
[52] In its closing argument, the State stated that Pam had told Saxton the keys were at the house, however a review of the record indicates that no such testimony was given at trial.
[53] Saxton had two attorneys representing him during this trial.
[54] An allegation was later made that the witness had been told by the police that it would be in her best interest not to appear.
[55] Among specifics, the record shows that the bike pedals were never tested for signs of accelerant and no ultraviolet illumination was done at Saxton's home to check for signs of accelerant. It is incredible that Saxton could leave Taranda's home with accelerant on his shoes, which is what was implied by the print on the bottom of the tennis shoe and the State's expert witness, yet none of this accelerant would rub off on the pedals of a bike allegedly ridden by Saxton for approximately one mile.
[56] The easy remedy to the potential problem of conflicting statements would be for the State to grant her immunity for her testimony. The witness was called by the State as the defense chose to rely on the affidavits. However, the State did not make any offers of immunity on the record. This raises the question if the State is concerned that Ms. Bonds will testify consistent with her affidavits rather than with the statement made to the police, allegedly under duress.
[57] Both Lucius Jones and Stephanie Pittman both testified that they felt intimidated and/or harassed by officers to testify against Saxton. This may indicate a pattern of conduct that may have caused the witnesses to testify differently than otherwise they would have.
[58] No final determination of any misconduct has occurred. There is not enough information to determine exactly what occurred between the various witnesses and the police. However, none of the allegations of harassment have been rebutted by the State.